(Decided 11th March, 1885.)

---

JAMES JAMES, and JAMES GAMBLE *vs.* THE STATE OF MARYLAND.

*Pool selling—Horse races—Gambling.*

The selling of pools on horse races, and the keeping of rooms where such pools are sold, do not constitute an offence within the meaning of the statute against gambling.

APPEAL from the Criminal Court of Baltimore City.

The case is stated in the opinion of Judge BRYAN.

The cause was argued before ALVEY, C. J., STONE, MILLER, ROBINSON, RITCHIE, and BRYAN, J.

*Wm. Pinkney Whyte,* for the appellants.

If a horse race is not a game of chance, and not forbidden by law, and betting on a horse race is not prohibited by the Maryland statutes, then it is contended that the use of a black-board to register such bets is not a violation of our statutes relating to gaming, and the appellants were improperly convicted.

The three modes of " pool-selling " described in the evidence are all dependent upon the same question, for they are all merely the registration of bets, made in different forms, upon horse races. The statutes of Maryland on the subject of betting are specific and limited. The betting or wagering which constitutes an offence, must be done at a " game ;" at a " device ;" at a " contrivance," all of which things are to be deemed "gaming tables." Thus only is the betting unlawful. Betting of itself is not unlawful in this State, nor was it an offence at common law. *Commonwealth vs. Avery,* 14 *Bush,* 639. Betting on elections generally, is not gaming. An election is not a game; it is not a "device," or a " contrivance," though many devices and contrivances are resorted to to win them. *State vs. Henderson,* 17 *Ind.,* 128; *Woodward vs. McQueen,* 11 *Ind.,* 14; *McHatton vs. Bates,* 4 *Blackf.,* 63.

Betting on the general result of a presidential election, or on an election outside of Maryland, is not unlawful. The Maryland statute only prohibits betting or wagering on the result of any election to *take place in this State. Revised Code, Article* 5, *section* 85.

Betting on a horse race is not prohibited by statute. A horse race is not a "game," " device," or " contrivance," at which money is won or lost by betting or wagering. A

horse race is not a "gambling device" within the meaning of the 17th section of Article 8 of Act "concerning crimes and penalties" in Missouri. *Revised Code of Missouri, page* 627, *section* 17, 1855.

It is a great perversion of language to call a horse race a "gambling device." *State vs. Hayden*, 31 *Mo.*, 35, 36; *State vs. Borie*, 23 *Ark.*, 726-8; *Commonwealth vs. Shelton*, 8 *Gratt.*, 592, 598; *Harless vs. United States*, 1 *Morris*, (*Iowa*,) 169.

Bets on horse races are not gaming contracts. *Kirkland vs. Ransom*, 8 *Texas*, 10. Horse races are not prohibited, and bets on them are sustained in Texas. *McElroy vs. Carmichael*, 6 *Texas*, 454.

When the gaming laws of Maryland were modified in 1880, an effort was made in the House of Delegates to prohibit "pool selling," but was voted down. *See Journal of House*, 1880, *page* 1215.

Horse races have not been prohibited by law in Maryland, but they are recognized and encouraged. Since 1826, the clerks of the Courts in the counties have been authorized by law to issue licenses to sell liquor at *horse races. Revised Code, Article* 12, *section* 25. In 1872, the Maryland Jockey Club was organized, thus showing the policy of the State. *Act of* 1872, *ch.* 55.

The object is, ostensibly, to improve stock. Meetings for the exhibition and trial of the speed of such animals, and premiums or purses to be awarded to the winners. Even the city police force is to be detailed to keep order on the track. Here, then, is the recognition of the horse race, as worthy of encouragement by the State, and no statute prohibiting the betting on a horse race.

Now, the State contends, that it is not the horse race nor betting on it which constitutes the offence, but it is the manner in which the defendants conduct themselves in receiving money laid on horse races, and paying it to the winners; and to sustain this view of the case, resort is had

to the decision of the Court of Queen's Bench in *Tollett vs. Thomas*, 6 *Queen's Bench*, (*Law Rep.*, 520,) that the use of a *machine*, called the "Paris Mutual," is a *mechanical contrivance*, and as such, "*an instrument* of gaming," the use of which is prohibited by the English Statutes of 31 and 32 Vict., ch. 52, sec. 3. The Court of Queen's Bench did not decide that a horse race was a game of chance, but that the use of the *machine* changed it from a lawful to an unlawful game, and introduced an element of chance in it.

There was no "Paris Mutual," no *machine* used by the appellants, and no element of chance introduced. They but *registered openly* the bets made by others, and after deducting their small commission for their labor, paid over the balance of the money to the winners, who held the tickets.

The Kentucky case of *Commonwealth vs. Simmonds*, 79 *Ky.*, 618, follows the English case, and relies upon the use of the "machine" as a contrivance. But the statute of Kentucky expressly prohibits the use of a "*machine or contrivance used in betting*," and expressly covered the case of the use of a "machine" or "mechanical contrivance" in any sort of betting, and it could not be disputed that the "Paris Mutual" is a "machine"—and being "used in betting," which is unlawful in Kentucky, the party was properly convicted.

But "pool selling" is not prohibited, and the seller of pools cannot be convicted of "gaming" in Kentucky, as is shown in the case of *Cheek vs. Commonwealth*, reported in the same volume, 79 *Ky.*, 362.

The case of *People vs. Weithoff*, 51 *Mich.*, 209, also cited by the State, follows the English case, but beside this, "*betting of every description*" is made punishable under the laws of Michigan, and money "*lost by any betting whatever*" is spoken of as lost by gaming in their statutes; and the learned Judge considered this previous legislation as throwing light upon the *intention* of the

Legislature in denouncing gaming, and in making no dis-
tinction between betting and gaming. All that these de-
cisions maintain is that the use of a "machine," which is a
mechanical contrivance, may introduce an element of
chance, and therefore the machine becomes an "instru-
ment of gaming" under the English law, and a gambling
contrivance under the Kentucky law, and a register of
betting under the Michigan law, by which all betting is
prohibited.

But none of these cases apply to the law of gaming as
it is understood in Maryland. And pool selling, as de-
scribed in the evidence in this case, is not prohibited in
this State, and the evidence was not admissible to sustain
an indictment under the gambling laws.

*Edgar H. Gans, Assistant State's Attorney for Balti-
more City,* and *Charles B. Roberts, Attorney-General,* for
the appellee.

The questions presented by the exception to the evi-
dence which the Court admitted are—

1. Is a room kept for pool selling as described in the
bill of exception a "place of gambling" within the mean-
ing of the Act of 1882, ch. 271?

2. Are any of the contrivances mentioned in said bill of
exception "gaming tables" within the meaning of Article
72, section 154, of the Revised Code?

I. The word gambling, in this Act, is not to be given a
strict construction. Section 156, of Article 72, expressly
provides that the gaming law shall be liberally construed
so as to prevent the mischiefs intended to be provided
against. All the mischiefs of gambling are to be found in
the pool rooms under indictment, and they should there-
fore be brought within the terms of the statute, if that can
be done by any fair and reasonable construction.

Gambling includes more than betting on an uncertain
event, for a bet on an election is not gambling. But when
there is betting on an uncertain event, and that event is

James & Gamble *vs.* State.

reached through the process of a game, then the betting is gaming or gambling. Horse racing is a game, and betting on horse racing is gaming. *People vs. Weithoff*, 51 *Mich.*, 212; *Tollett vs. Thomas*, 6 *Q. B.* (*L. R.*,) 520; *Comm. vs. Simmonds*, 79 *Ky.*, 618; *Edwards vs. State*, 8 *Lea*, 411; *Scollons vs. Flynn*, 120 *Mass.*, 271-3; *Tatman vs. Strader*, 23 *Ill.*, 493; *Garrison vs. McGregor*, 51 *Ill.*, 473; *State vs. Posey*, 1 *Humph.*, 384; *State vs. Blackburn*, 2 *Cold.*, 235; *Wading vs. Deming*, 9 *Ind.*, 35; *Cheesum vs. State*, 8 *Black.*, 332; *Wilkinson vs. Tousley*, 16 *Minn.*, 299; *McLane vs. Huffman*, 30 *Ark.*, 428; *IX Anne*, ch. 14, *Alexander's British Statutes*, 690; *Gough vs. Pratt*, 9 *Md.*, 526; *Goodburn vs. Mosley*, *Strange*, 1159; *Blaxon vs. Pye*, 2 *Wils.*, 309; *Grace vs. Allen*, 1 *Allen*, 563.

Gambling, however, is not punishable in our State, and therefore a bet on a horse race, though gambling, is not indictable. Act of 1842, ch. 190, sec. 3; House Journal, 1880, page 1216; Section 153, of Article 72 of the Revised Code.

But the offence which the statute punishes is keeping a room, table, &c. for gambling, and offering its temptations to the public. Horse races are games of chance. *Tollett vs. Thomas*, 6 *Q. B.*, 520.

II. The evidence was admissible under the first count, as the black-board, tickets, &c. mentioned in the bill of exception were "contrivances at which money was bet or wagered." See cases *supra*.

*Bryan, J., delivered the following opinion, in which Ritchie, J., concurred:

The appellants were indicted in the Criminal Court for violating the statutes against gaming. The indictment contained six counts. The first count charged that they "did keep a certain gaming table for gambling then

---

*While four of the six Judges before whom this case was argued, concurred in reversing the ruling of the Criminal Court and in granting a new trial, a majority of the Court failed to unite in the same opinion.

and there, other than a billiard table, the said gaming table being then and there a contrivance at which money was then and there bet and wagered on horse races." The second and third counts charged them with "managing and having an interest in, and in the profits of" the same kind of gaming table. The fourth and fifth counts charged them with keeping and managing a room for gambling. The sixth count charged that they being the occupants of a certain room, "did knowingly permit a gaming table, other than a billiard table, to be then and there kept therein, for gambling thereat."

At the trial of the case, the State offered to prove that the appellants, at their rooms in the City of Baltimore, sold cards or tickets to purchasers of the various pools, known as "Auction," "Mutual" and "Combination" pools, which were described as follows:

The "Auction pools" were conducted according to the system following:

A certain number of horses is entered to run at a certain race, to be held at a certain time and place. Any person desiring to invest money in a pool or race, offers to the auctioneer a certain amount of money for the choice or selection of a horse, which he supposes will be the winner of the race. A number of bids may be offered for the first choice. The person offering the highest amount obtains the first choice or selection of the horse which he supposes will be the winner, which horse he then and there names; the amount then and there offered for the first choice, is then and there deposited in the hands of the parties conducting the pools. It often occurs, that after several different choices are selected by the persons bidding, there remains a number of horses undisposed of—these are called "the field." These are taken together by the person offering and depositing the highest amount for the same. The amount so deposited for each choice, and the field, (if there be a field,) are added together, and the total constitutes

James & Gamble *vs.* State.

what is commonly called "the pool." Each person so depositing his money on his choice or on the field, receives a card or receipt for the same, showing the horse or (if on the field) the horses selected, the amount so deposited, and the total amount in the pool. The money in the pool (less the commission of five per cent. to the person or persons conducting the pool) is paid to the person having selected the winning horse in the race, upon presentation of the card or receipt aforesaid, to the person conducting the pool.

The "Mutual pools" are conducted as follows:

A list of the horses in a certain race is placed upon a black-board in the open view of the bidders, and to each horse, on the left of their names, is attached a number, and to the right of their names is left an open space to show the number of times the horse has been chosen. A person wishing to invest money on a certain horse, purchases of the person having charge of the pool, a card or receipt, commonly called a ticket, stating at the time the horse upon which he wishes to purchase the card or ticket, which ticket has on its face a number which corresponds with the number attached to the name of the horse on the black-board. The number is used merely to facilitate business, and has no other significance.

When the purchase has been made, the pool indicates the whole number of cards, receipts or tickets sold or taken upon the said black-board, placed in the open view, and this is correctly marked from time to time, as each ticket or card is purchased or taken. When the pool is closed, the total amount invested on the different horses is added together, and is seen on the blackboard aforesaid, and is called the total, and the total constitutes that pool. The total, less the commission of five per cent. to the person conducting the pool, is divided into equal sums and paid to the persons having selected, taken or purchased the cards or tickets on the winning horse, upon presentation of these

cards or tickets. Any number of persons, acting separately, may choose the same or any horse in the race, and the amount paid for each card or ticket is the same. The number of cards or tickets sold or taken on each horse is unlimited. Any person may buy or take as many cards or tickets on each horse, or upon any horses in the race, as he chooses.

The "Combination pools" are somewhat similar to the "Mutuals." In the Combination pools, there must be three contests or races. The person speculating in Combination pools, must select his choice in the races, the same as is done in the Mutual; but in order to win, he must have selected the winner in each of the three races. If any one of the horses chosen by him fails, he wins nothing. Any number of persons may select the same combination, and if any particular combination wins, the persons having selected that combination, are entitled to the whole amount, (less the five per cent. commission to the persons conducting the pool,) to be equally divided upon producing their cards or tickets. The sum deposited on each selection of a combination is uniform. Persons purchasing these combination tickets may decline to name any combination, and purchase the field, and should all the combinations fail, the pool, less the commission aforesaid, is divided among those holding tickets on the field.

The appellants objected to the admissibility of the evidence, but the Court overruled the objection, and allowed the evidence to be given. The question for us is whether these facts, supposing them to be proved to the satisfaction of the jury, tended to shew that the appellants were guilty of any of the offences charged in the indictment. The Act of 1882, ch. 271, prescribes severe penalties for these offences; but we must look also to the sections under the head of gaming in the thirtieth Article of the Code, in order to ascertain the precise nature of the acts which are made criminal by the law. The fifty-seventh

section declares that any kind of table, except a billiard table, at which any game of chance shall be played for money, or any other thing, shall be deemed a gaming table. And to prevent the defeat of the law by evasion or stratagem, the sixty-second section was enacted. It is in these words: "All games, devices and contrivances at which money or any other thing shall be bet or wagered, shall be deemed a gaming table within the meaning of the preceding sections." If we should give a merely verbal interpretation to these sections; or if we should construe them in an astute and technical spirit, we would defeat their meaning. If, for instance, taking the very words of the sixty-second section, we should say that it enacts that all games at which money or any other thing shall be bet are gaming tables; horse races are such games; and therefore horse races are gaming tables, we should arrive at a result manifestly ridiculous, and very far distant from any intention which could be attributed to the Legislature. The safe and just rule requires us to disregard verbal subtleties, and to seek the meaning of the statute law from a consideration of all its parts, and a comparison of it with other legislation affecting the matter in hand. We think it evident from the fifty-seventh section that it is the playing of a game of chance which impresses on a gaming table its criminal character. The game of chance is the obnoxious transaction which the statute seeks to prevent. If this can be prevented, the objects of the statute will be fully attained. But it was anticipated that the ingenuity of offenders would invent various subterfuges to evade the law, and therefore the sixty-second section was enacted, to the intent that no trick or stratagem should avail for this purpose. This section is in harmony with the fifty-seventh, and is in furtherance of the same object. It was not intended to change or modify in any respect the test by which the criminal character of a gaming table was to be ascertained.

That test was to remain as already enacted; that is to say, it was the playing of a game of chance for money or any other thing. The fifty-sixth section provides as follows: "No person shall keep any gaming table, or any house, vessel or place, on land or water, for the purpose of gambling." The fifty-ninth section, both in its original form and as amended by the Act of 1882, ch. 271, makes it penal to keep any " gaming table, or other place of gambling." These sections regard a gaming table as a place of gambling, and provide that neither it nor any other place should be kept for this purpose. We see from these sections what conduct the Legislature intended to describe by the term "gambling." It was playing at that kind of a game which gave a criminal character to the table at which it was played; that is to say, it was playing any game of chance for money, or any other thing. This was the conduct which brought down punishment upon those who kept a table or other place where it was permitted. If we could suppose that the term "gambling" included other games besides those which were forbidden at a gaming table, we should reach this singular anomaly; we should hold that the Legislature intended to permit some games at a gaming table which were forbidden in other places. But nothing is more clear than that the Legislature intended to visit with punishment the keeping of every place where such games were played as were obnoxious to its censure.

We are now prepared to examine the evidence which was admitted in the Criminal Court. If the persons, who purchased the tickets in the various pools, were playing at a game of chance, then the appellants were keeping a gaming table, and a place for gambling. The object of purchasing these tickets was to wager money on certain horse races. No ordinary interpretation of language would describe their conduct as the playing of a game. When a man hazards his money on the rise or fall of

prices of stocks, cotton, grain, or other commodities, it cannot in the proper use of language be said that he is playing at a game of chance, nor can the place where such ventures are made and registered be designated as a gaming table. Bets are made, and money hazarded on many of the uncertainties and contingencies of life, but in the common use of language, these transactions are not called games of chance. The contingency on which these appellants wagered their money was the result of a race; in one event they would win, in another they would lose. It may be said that many elements of uncertainty were involved in the wager by reason of the various combinations which might be made in the pools. But nevertheless the thing which was to determine gain or loss was the success of the horses chosen. If by any singular subtlety of discourse a horse race could be shewn to be a game of chance; by the same reason we must hold that it was played on the race course, and that the horses were the players. Such disquisitions are very far removed from the ordinary method of thought prevailing among men. It is not consistent with the just and benign spirit of our law to give to a criminal statute an interpretation which can be maintained only by a keen and scholastic ingenuity. The meaning of the law which consigns a man to prison, or deprives him of his property should be plain and obvious, and easily understood by an ordinary capacity. Betting money is not an offence by the common law; and is punishable only in the particular cases which are made criminal by statute. Horse races have been in some measure favored by our legislation. By the 18th section, of Art. 56, of the Code, the clerks of the Circuit Courts are authorized to issue licenses for the sale of spirituous and fermented liquors at horse races. And the Maryland Jockey Club was incorporated by the Act of 1872, chapter 55. Persons may attend the races and hazard their money as freely as they choose by betting:

on the horses, and they will not thereby become amenable to any legal penalties. The Jockey Club holds its meetings for these races under the authority given by the Legislature in its charter of incorporation. If betting money on the horses, were regarded by the law as playing at a game of chance, the race course would be "a place of gambling" within the meaning of the statute, and the Jockey Club would be indictable for maintaining it. But we have seen that they have the express authority of the Legislature for these races. It may be urged that wagering money on a horse race is as immoral and as evil in its consequences as playing at a gaming table; and that these pool rooms present to the idle and dissipated all the temptations which belong to any form of gambling. But such arguments do not justify us in extending the statute beyond the bounds of a just and reasonable construction of its language. It is for the Legislature to make such changes in the law as it may consider the public good to require. Our functions are limited to interpreting and enforcing the Legislative will when it has been declared; and it would be very unwarrantable in us to permit any private sentiments of our own to affect the construction which we give to these statutes.

In the argument of this case at the bar we were referred to many authorities from the Courts of other States, and to some from England. We have given them attentive consideration; but as the statutes which they construe are very different from our own, we have not been able to derive much aid from these sources, even if we were disposed to follow the opinions of the learned Judges.

We think that the selling of the tickets and the keeping of the pool rooms mentioned in the evidence, were not violations of law, and that the ruling of the Criminal Court ought to be reversed.

*Ruling reversed, and*
*new trial granted.*

(Decided 11th March, 1885.)

STONE, J., delivered the following opinion, in which ROBINSON, J., concurred:

I agree to the conclusion reached by the majority of the Court, for the following reasons:

Pool selling is nothing more or less than betting on horse racing, and keeping a pool room is keeping the place where such bets are made.

The section of the statute is as follows:

"All games, devices, or contrivances, at which money, or any other thing shall be bet, or wagered, shall be deemed a gaming table, within the meaning of the preceding sections."

To my mind, the plain and obvious meaning of this section is, that it is confined to games, devices and contrivances, at which money might be *then and there, lost or won.* That it certainly never was the intention of the section to include a place where *bets are made on a future and uncertain event.*

A sale of stock on a margin is nothing more or less than a bet that a certain stock will rise or fall in price within a limited time. The stockbroker holds the stakes, which is the margin put up, and is paid a commission for so doing. The stockbroker's office is the place where the money is put up, and the broker receives his commission.

The pool seller, as he is termed, receives the money of persons who bet on a horse race, or a Presidential election to come off in the future, charges a commission for it, and pays the money won, to the winner, and for this purpose he rents a room where he can be found, and advertises it.

If the pool seller can be convicted under this statute, why not the stockbroker?

I think the "games, devices and contrivances" necessary to make a "gaming table," *must be under the control of the players, and used by them,* before the statute is infringed. That is what the Legislature intended. They

intended to prohibit any person from setting up, *in any place whatever*, "a game, device or contrivance" *under the control or ownership of some person playing at, or managing it*, and at which the public were solicited and expected to play.

The horse race or the election is not under the control or management of the pool seller, and is not a "game, device or contrivance" of his. It is something away and apart from him and over which he exercises no control.

Betting on a horse race is certainly not keeping a "gaming table." It is supposed that keeping a room where such bets are registered, is. When the very Act under which the traverser is indicted, was before the Legislature, an amendment was offered, making "*pool selling*," gambling within the meaning of the Act, and this amendment was rejected. And now this Court is asked to say that "pool selling" is "gambling" in the face of the fact, that the Legislature refused to make it gambling.

Why can we not resort to the proceedings of a Legislature, to ascertain the meaning of a doubtful statute? We constantly resort to debates in conventions, both State and National, to ascertain the true meaning of a constitutional provision. Why then can we not resort to the positive and explicit declaration of a Legislature of what it intended to exclude from a statute?

Pool selling is not a common law offence, but is dependent entirely upon statute. When the gaming laws of the State were modified in 1880, an effort was made to include pool selling, but it was voted down, by a decided vote. This of itself would be decisive, in my view, of the question. If we are wrong, the Legislature can soon remedy it, but the Legislature cannot remedy an improper conviction.

I agree fully as to the evils of pool selling, but think the remedy is in amending the statute, and not by a strained construction of it.

ALVEY, C. J., delivered the following dissenting opinion:

Being utterly unable to agree with the majority of the Court in the opinions filed in these cases, I shall state briefly the ground of my dissent.

The traversers in these cases were indicted and convicted under the statute law of this State made for the suppression of the vice of gambling; and the principal and leading question is, whether the evidence set out in the bills of exception, offered on the part of the State, was properly admitted by the Court below, as tending to prove the violation of the statute as charged in all or any one of the counts in the respective indictments,—the indictments in both cases being substantially similar in the character of the offences charged.

The indictment in each case contains six counts; but it is not necessary to notice particularly more than the first and fourth of them. By the first, it is charged that the traversers, at a certain time and place, "did keep a certain *gaming table for gambling*, the said gaming table being then and there a contrivance at which money was then and there bet and wagered on horse races," etc.; and by the fourth count it is charged, that the traversers, at a certain time and place, "did keep a certain *place*, to wit, a room, for *gambling* then and there," etc. The various other counts in the indictments were framed to cover the several cases or condition of circumstances provided for in the statute under which the prosecutions were instituted.

As will be observed, the offences charged in the two counts recited, are not for gaming, or for betting on games of chance, but are for keeping a gaming table for gambling, such as the law declares to be such, and for keeping a place for gambling. The indictments were framed under section 59 of Article 30 of the Code, as amended and re-enacted by the Act of 1882, ch. 271. By that section of the Code, it is provided that "Any person who shall *keep* any *gaming table*, or *other place of gambling*

in this State; or who shall deal at any such gaming table, or other place for gambling in this State; or who shall in any way manage such gaming table, or other place for gambling in this State; or who shall have any interest in any gaming table, or the profits thereof; shall be deemed to be guilty of a misdemeanor," etc.

This section of the Code is to be taken and construed with, as part of the same law, sections 62 and 64 of the same Article; by the first of which it is provided, that "all *games, devices* and *contrivances*, at which money or other thing shall be bet or wagered, shall be deemed a gaming table, within the meaning of the preceding sections ;" and, by the 64th section it is provided, that "The Courts shall construe the preceding sections, relating to gambling and betting, *lib'erally*, so as to prevent the mischiefs intended to be provided against."

As I have said, the question is as to the admissibility of the evidence offered by the State, and admitted by the Court. It is not denied or in any manner controverted, that the traversers, in both of the cases, kept places or rooms for selling pools on horse races, by the methods and according to the schemes described in the bills of exception. It is unnecessary to repeat them here, as they are fully stated by Judge BRYAN in his opinion; but that they come fully within the mischief intended to be provided against cannot, in frankness, be denied.

The specific questions presented, on the offer of the evidence stated in the exceptions, are, 1st, Whether any of the contrivances described in the bills of exception constitute a "gaming table kept for gambling," within the meaning of, and as defined by, the statute? and, 2nd, Whether a room kept for selling pools on horse races, as described in the exceptions, is a "place for gambling," within the meaning of the statute? In my opinion both of these questions ought to be resolved in the affirmative.

1. The question whether the game, dependent upon future contingencies or eventual results, upon which the

money or other thing may have been bet or wagered, was legal or illegal, is wholly immaterial. That is not the subject-matter of the statute. Betting on horse races, on games of cards, or other games, not fraudulent in their nature, may not be made criminal offences; but in view of the evil to and demoralization of the public, resulting from the practice of such games and the betting thereon, the Legislature has undertaken to prohibit, under severe penalties, the opening and keeping of gaming tables, or other places, to tempt and seduce the public into the vicious practice of gambling. This is the evil sought to be suppressed by the legislation upon the subject; and it is for the flagrant disregard of this wholesome prohibition of the statute that these prosecutions have been instituted.

It is supposed, however, that no gar es are contemplated as being within the meaning of the statute except such as may be played as games of chance, strictly as such, and because a horse race cannot be played as such game it cannot be regarded as within the parview of the statute. To say the least of such construction, it is severely literal and strict; indeed, so strict and narrow that it, to a great extent defeats the objects of the law. What did the Legislature mean when it declared that all *games, devices and contrivances,* at which money or any other thing shall be bet or wagered, shall be *deemed* a gaming table within the meaning of the law? It did not certainly mean only an ordinary gaming table and the playing of games thereon. It clearly meant something more than that; and therefore whatever device or contrivance that may be resorted to or used is declared to be a gaming table, not because it is a table in fact, but because the law, for its own purposes, declares that it shall be treated as a gaming table. Of course, the Legislature understood that other implements and appliances than tables were or might be used in gambling; and hence the provision that

all other devices or contrivances should be treated as gaming tables. Therefore it is no departure from the sense or meaning of the statute, that the use of the blackboard, with the names thereon of the horses entered for the race, the numbers and combinations, such as are necessary to form the "Mutual" and the "Combination" pools, the selling the pools or the chances therein, and the giving tickets therefor, are charged and treated as a device or contrivance constituting a gaming table, within the meaning of the statute, at which money has been bet or wagered on horse races, if a horse race can fairly be denominated a game, and betting thereon comes within the definition of gambling. And in regard to the question whether a horse race is a game and the betting thereon gambling, the authorities leave no room for question or doubt. In the case of *Blaxton vs. Pye,* 2 *Wils.,* 309, it was expressly held that although horse racing was not mentioned in the *St. of* 9 *Anne, c.* 14, against gaming, yet it was within the general words, *other game or games;* and it was so held in the previous case of *Goodburn vs. Marley,* 2 *Str.,* 1159. Other cases hold the same thing. *Grace vs. McElroy,* 1 *Allen,* 563; *People vs. Weithoff,* 51 *Mich.,* 203. And not only is a horse race a game, but pools formed thereon, according to the methods here described, are games, and which pools so formed being combinations of bets or wagers for money, dependent upon the issue of the game upon which they are formed, constitute gambling within the reason and sense of the law, and the contrivance for such gambling is a gaming table. *Tollett vs. Thomas, L. R.,* 6 *Q. B.,* 514; *People vs. Weithoff, supra; Edwards vs. State,* 8 *Lea.,* 411. And the fact that the race may not take place at once, but at some future time and at some distant place, in no manner affects the question.

2. But conceding, for the sake of the argument merely, that there is room for doubt on the question of the keeping

of a gaming-table for purposes of gambling, ought there to be any such doubt in respect to the question of keeping a *place for gambling,* within the meaning of the statute? This does not appear to have been treated as a distinct question in the opinions of the majority of the Court, though, in my opinion, the evidence offered and admitted brings the case plainly within the purview of the statute, and fully supports the charge contained in the fourth count of the indictment.

As already stated, it is not denied that the traversers in each of these cases did keep rooms in the City of Baltimore for the purpose of carrying on the business of selling pools on horse-races, according to the methods described in the bills of exception. In one of the cases it is stated that the managers would make bets directly with their patrons, according to the method stated, that is, the manager of the Combination pools would bet a person ten to one that a certain combination would not win; the person betting against that odds paying a dollar, and if the combination won, he would be entitled to eleven dollars, otherwise he would lose his dollar staked. And similar betting was made in the other pooling schemes practiced in these rooms.

This being the case, upon what conceivable reason can it be said or contended that these rooms were not places for gambling, within the meaning of the statute? There was betting, and betting for money on games; and the place where this was daily and habitually practiced, as stated in the exception, was certainly a place for gambling. To say that it was not, is simply to defy well accepted definition of terms. And that the keeping of such places is within the mischief, and has all the evils attending the keeping of gaming tables, and other places for gambling, cannot admit of a serious question. It is said, however, that this pool selling and betting on races, is not *playing at games of chance,* and therefore not within the

statute; it being conceded that if the persons buying the pool tickets could be considered as *playing* at a game of chance, then the place would be considered as a gaming table or a place kept for gambling. This makes the decision turn upon the fact of the actual then and there playing the game of chance upon which the wager is made; and if the game, whatever it be, is not then and there played to its final issue by the parties concerned in the wager, the statute does not apply. To such a construction, especially in view of the requirement that the statute shall be construed liberally to prevent the mischief contemplated, I cannot for a moment accede. I am unable to discover anything in the terms of the statute that restricts its application to the case of the *actual playing* of the games upon which the wagers are made. As I have said, it is the keeping of places for gambling that is denounced by the law. Anything, therefore, that falls within the definition of gambling is within the statute. The playing of games may be one thing, and in their nature not unlawful; but the wagering or betting of money thereon is quite a different thing, and the parties thus betting their money may not at all participate in the *actual playing* of the games. It is, as before stated, the keeping of places open to tempt the public to indulge in the habit and vice of gambling for money or other things, that constitutes the evil and the mischief intended to be restrained, and the statute should be liberally construed for the accomplishment of the object in view.

An argument against the construction, which applies the statute to the forming and selling of pools on horse races, is attempted to be drawn from the fact, that in 1880, when an Act making some modification in the law in respect to gaming was before the Legislature, there was an amendment offered in the House of Delegates, making, by express terms, the Act to embrace pool selling, and which amendment was voted down. For what reason the

amendment was defeated does not appear; nor can we form the slightest conjecture from such vote, apart from the statutes themselves, what may have been the views and intentions of the Legislatures that passed the laws that we now have in the statute book upon this subject. It is, however, perfectly clear that the Court has no right to recur to such vote in placing an interpretation upon the statute. As was said by Chief Justice TANEY, speaking for the Supreme Court of the U. S., in *Aldridge vs. Williams*, 3 *How.*, 1, 24, "In expounding a law, the judgment of the Court cannot, in any degree, be influenced by the construction placed upon it by individual members of the Legislature in the debate which took place on its passage, nor by the motives or reasons assigned by them for supporting or opposing amendments that were offered. The law as it passed is the will of the majority of both houses, and the only mode in which that will is spoken is in the Act itself; and we must gather their intention from the language there used, comparing it, when any ambiguity exists, with the laws upon the same subject, and looking, if necessary, to the public history of the times in which it was passed." And the same principle was fully stated and acted on by the same Court, in the case of the *United States vs. Union Pacific R. R. Co.*, 91 *U. S.*, 72, 79.

For the reasons I have stated, I am of opinion that the evidence contained in the bills of exception in these cases was properly admitted by the Court below, and that its rulings ought to be affirmed.


MILLER, J., delivered the following dissenting opinion:

In view of the broad and general language of the first section of our statute against gaming (as embodied in the Code,) which forbids the "*keeping of any place for the purpose of gambling,*" and the express command of the Legislature to the Courts, contained in a subsequent section, to

construe all the preceding sections "*liberally,* so as to prevent the *mischiefs* intended to be provided against," I cannot doubt but that the pool-rooms carried on as described in the testimony in these cases, are places kept for the purposes of gambling within the meaning of the statute thus required to be construed.

This testimony shows that these rooms were kept "for the purpose," to quote the exact words, "of carrying on the *business* of selling pools on horse races." These consisted of what are termed Combination pools, Auction pools, Mutual or Paris Mutual pools. The mode in which these several pools are made up, and the facilities provided for that end, are then described, but these need not be stated, for they are so well known as to have become almost matters of common knowledge. The appellants, as keepers or "managers" of the rooms and pools, received *five per cent.* of all the money put up or wagered by the betters, or, as in one part of the testimony, they are modestly termed, "*the patrons*" of the establishments. They would also, themselves, make bets directly " with their patrons," as for instance they would bet a person ten to one that a certain combination would not win, and the better would pay one dollar, and if the combination won, he would be entitled to eleven dollars, otherwise he lost the dollar he put in. The testimony further shows that this business of pool selling or betting on horse races was *daily* and *habitually* carried on by the appellants in these rooms, the races being both in this State and in many other parts of the country.

To my mind it is clear that these rooms are places kept "for the purpose of gambling," and that to hold otherwise is to ignore the plain meaning of the plain language of the statute, as well as to subvert its spirit and intent, and to disregard the express injunction to give it a liberal construction in order to suppress the mischiefs against which it is aimed. It is evident that they afford like facilities

and accommodations, and hold out the same invitations and temptations to the public as other places where other kinds of gambling are carried on. The resulting evils are also obviously the same. The fact that the contest or game upon which the bets or pools are made is innocent in itself, is of no consequence. Mere *betting* on horse races, or at cards, or at any other game, has not been made a *criminal offence* in this State, though common experience has shown that many evils often proceed therefrom. But such evils, and the chances of them, are greatly multiplied when a house or room is specially set apart and devoted to the purposes of gambling, and it is upon the recognition of this fact that our statute punishes the keeping of such places, while it does not punish the mere laying of wagers or betting.

The Legislature has on several occasions modified those sections of the statute which prescribe the *penalties*, but has never, since the adoption of the Code, changed the sections already referred to, or others which define and prohibit the offences. One of these modifying Acts is that of 1880, ch. 149, and it appears from the Journal of the House of Delegates that when this Act was before that body, an amendment was offered so as to make it an offence, and to punish *any person* "who shall sell by auction any pool or ticket representing pools or tickets on the Paris Mutual plan, or 'make books,' in which are recorded *bets* dependent upon horse races, or who shall *sell or dispose of the privilege* of selling auction pools or tickets on the Paris Mutual plan, or of making books dependent upon horse races at Pimlico or elsewhere in this State." This amendment was rejected by a vote of twenty-six in the affirmative and thirty-six in the negative, and its rejection has been strongly relied on by counsel for the appellants as demonstrating that a majority of the House of Delegates refused to declare the selling of pools on horse races, or the keeping of places or rooms for that purpose

an offence, and it is insisted that this vote must be accepted by the Court as a legislative construction that the keeping of rooms where such pools are sold is not within the first or any other section of the gaming statute. Assuming (but without expressing an opinion to that effect,) that it is legitimate for the Court to resort to the Journals of the Legislature showing the amendments offered with the votes thereon, to a particular bill, for the purpose of determining the construction of the Act when it becomes a law, or the construction of an antecedent statute upon the same subject, I am unable to draw from this amendment and vote the conclusion for which counsel have contended, and for several reasons. In the first place, it is impossible for the Court to ascertain precisely what reasons or motives influenced those who voted *pro* and *con* on this amendment, for there is no official or authorized report of the *debate*, if any there was, on this subject. Again, the amendment says nothing about the *keeping* of a house, or room, or place for the constant sale of such pools, by which gambling and its evils are encouraged and enhanced, and it goes far beyond the provisions of the first section of the gaming statute and any construction thereof which these cases call for. It in fact created new offences. If it had become part of the law it would have punished the sale by any one of a *single* pool or a *single* ticket therein, as well as the making of books (which any one may carry about in his pocket,) in which bets on horse races are recorded, and it is at least reasonable to infer that the majority of the Delegates were unwilling to go thus far, and therefore voted down the amendment. Lastly, the bill itself probably encountered opposition on account of its severity. It largely increased the punishments prescribed by the previous law, and contained other stringent provisions, some of which were repealed by the subsequent Act of 1882, ch. 271. The Journal also shows that several other amendments were offered by the same minority,

which were also voted down.    In fact, it appears to be a case, so far as the Journal shows, not unusual in legislative bodies, where a minority opposed to a bill seek, in order to defeat it, to clog it with amendments objectionable to some, and acceptable to others of the majority, and where the majority agree to reject all such amendments, in order to carry the measure.    That such was the case here is manifest from the fact that only *seven* of those who supported the amendment voted for the bill on its final passage.    The attempt thus to enlarge the scope of the bill by creating new offences, was simply a ruse to defeat it.    It seems to me, therefore, that this amendment, and the vote thereon, even if the Court is at liberty to consider them, have no significance whatever, so far as the present cases are concerned, because they leave entirely untouched the question these cases present.

I am clearly of opinion the ruling of the Court in each case, admitting the testimony excepted to by the appellants, respectively, should be affirmed.