GREENFELD *v.* MARYLAND JOCKEY CLUB
OF BALTIMORE

[No. 100, October Term, 1947.]

98

*Decided February 20, 1948.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Wilfred T. McQuaid* for the appellant.

*Lawrence Perin* and *William D. Macmillan,* with whom were *Semmes, Bowen & Semmes* on the brief, for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from a decree dismissing, on demurrer, a bill for (*a*) a declaratory decree that plaintiff is entitled, upon payment of admission charges, to attend any race meetings conducted by defendant and (*b*) an injunction against denial of this alleged right or interference with him "while in attendance as a spectator and bettor" at any race meeting.

The bill purports to state in substance various provisions of the Racing Commission law, (Code, Art. 78B, as amended), sets out Rule 226 of the Maryland Racing Commission: "The Chief Inspector shall keep a record of the names and addresses of all persons ejected by any Association from its grounds, together with the offense or offenses alleged against them, and any other material information relating thereto, and the Associations shall report all ejections to the Chief Inspector. He shall promptly report the same to the Maryland Racing Commission.", and alleges that: Defendant "is granted by the State a special privilege or franchise to conduct racing meetings with pari-mutuel betting" at Pimlico [*i. e.*, defendant has been licensed by the commission. Art. 78B, secs. 6, 7, 10.] Defendant's business "encourages gambling and betting by the public and is so open to fraud, trickery and deceit that it cannot be carried on as a strictly private business, and the intervention and participation of the State in the management, regulation and control of the business is necessary to protect the public interest". The business "is not a private enterprise", and defendant has "no right to operate it as a matter of common right", it is "a public or quasi public function in which the State participates directly in the management, conduct and control of the business" through the commission. Defendant "is exercising a public franchise granted to it by the State" for public purposes, *inter alia,* (1) "to legalize gambling and betting under State supervision and control and thereby discourage bookmaking, betting on numbers and other forms of illicit gambling by the public", (2) to provide increased revenue for the State and (3) "to improve the breed of horses", and "is therefore obliged to afford to all citizens the equal right to enjoy its facilities". On April 29, 1946 and again the next day plaintiff "purchased admission" to the Pimlico track and while properly demeaning himself as a spectator was, without just cause, forcibly ejected by defendant and told not to return and that if he did return he would be denied ad-

mission. Defendant refused to give him any just or lawful reason for ejecting him or denying him admission and has never reported that he was guilty of any offenses "as required by Rule 226", but asserts a right to so eject any patron at its pleasure "without any cause or reason whatsoever". Plaintiff's ejection and defendant's continued refusal (a) to permit him to attend race meetings and (b) "to comply with Rule 226", is "illegal, capricious, arbitrary and discriminatory" and constitutes a deprivation by defendant of rights and privileges guaranteed to plaintiff by Article 23 of the Declaration of Rights and denial by defendant, "as a duly constituted agent of the State", of the privileges and immunities and the equal protection of the laws guaranteed by the Fourteenth Amendment of the Constitution of the United States.

The questions presented in this case have not been decided in any previous case in this court, but precedents in other jurisdictions are not lacking. Plaintiff asserts a legal right, (a) at common law and (b) under the Racing Commission law, to attend and bet at any of defendant's race meetings. His claim at common law, as was said by Mr. Justice Holmes in 1913 in a case from the District of Columbia, is "an attempt to overthrow the rule commonly accepted in this country from the English cases, and adopted below, that * * * tickets [of admission] do not create a right *in rem*" (citing *Wood v. Leadbitter*, 13 M. & W. 838, and American cases). "We see no reason for declining to follow the commonly accepted rule. The fact that the purchase of the ticket made a contract is not enough. A contract binds the person of the maker but does not create an interest in the property that it may concern, unless it also operates as a conveyance. The ticket was not a conveyance of an interest in the race track, not only because it was not under seal, but because by common understanding it did not purport to have that effect. There would be obvious inconveniences if it were construed otherwise. But if it did not create such an interest, that is to say,

a right *in rem,* valid against the landowner and third persons, the holder had no right to enforce specific performance by self-help. His only right was to sue upon the contract for the breach. It is true that if the contract were incidental to a right of property, either in the land or in goods upon the land, there might be an irrevocable right of entry; but when the contract stands by itself, it must be either a conveyance or a license, subject to be revoked". *Marrone v. Washington Jockey Club,* 227 U. S. 633, 636, 637, 33 S. Ct. 401, 402, 57 L. Ed. 679, 43 L. R. A., N. S., 961.

Plaintiff says that in 1914 *Wood v. Leadbitter* was overruled in England by the Court of Appeals in *Hurst v. Picture Theatres Ltd.,* [1915] 1 K. B. 1. The *Wood, Marrone* and *Hurst* cases were all actions for damages for forcible ejection or exclusion. In the *Hurst* case the plaintiff was wrongly accused of entering a moving picture theatre without paying the price of admission. The three judges delivered separate judgments. Phillimore, L. J., dissented on the authority of *Wood v. Leadbitter;* Buckley, L. J., distinguished the *Wood* case, but also expressed disapproval of it; Kennedy, L. J., expressed great respect for the *Wood* case, but distinguished it on the facts, principally because the Judicature Act (1873) made equitable principles controlling in all actions, *e. g.,* whether for damages or for specific performance. In the instant case no question of breach of contract is presented. Whether plaintiff could recover (or was actually refunded) the price of admission paid by him in 1946 is not before us. The bill does not allege that plaintiff received a ticket purporting to give him more than a revocable license. Defendant has declared its unwillingness to contract with plaintiff; plaintiff cannot now "purchase admission" unless by concealing his identity or by indirection or mistake known to him. Plaintiff says the rule followed in the *Marrone* case (and subsequent American cases) is archaic and should be abandoned. We see no reason for declining to follow this rule, especially when no question of breach of contract

or specific performance is involved. The rule that, except in cases of common carriers, innkeepers and similar public callings, one may choose his customers is not archaic. In *Madden v. Queens County Jockey Club*, 296 N. Y. 243, 72 N. E. 2d 697, 698, decided April 17, 1947, (*certiorari* denied, 68 S. Ct. 63), a case not distinguishable from the instant case, the court stated the question and summarized its decision thus: "The question posed—which this court explicitly declined to consider in 1897, in *Grannan v. Westchester Racing Ass'n*, 153 N. Y. 449, 459, 47 N. E. 896, 899,—is whether the operator of a race track can, without reason or sufficient excuse, exclude a person from attending its races. In our opinion he can; he has the power to admit as spectators only those whom he may select, and to exclude others solely of his own volition, as long as the exclusion is not founded on race, creed, color or national origin." The clause last quoted has reference to the New York Civil Rights Law, Consol. Laws, c. 6.

Plaintiff says the *Madden* case was wrongly decided. He contends that (1) (*a*) pari-mutuel betting on horse races was unlawful at common law and (*b*) defendant has no right to conduct race meetings, with pari-mutuel betting, as a matter of common right, but only in the exercise of a "public franchise" granted to it by the State, and therefore (2) defendant is engaged in a public calling—is virtually a public utility—and is obliged to furnish betting "facilities" to all comers. As was held in the *Madden* case, we think plaintiff's premises and consequently his conclusion are untenable. We also question whether, if the premises were true, the conclusion would follow. If what plaintiff calls a "franchise" were actually a special dispensation to defendant to commit a crime, common knowledge and plaintiff's allegations regarding the evils of race track gambling would suggest that in regulating defendant's business the State would seek to restrict these evils, not to make them universal, and would not deprive defendant of the power to select its customers without risk of lawsuits and necessity of prov-

ing that persons excluded would use its "betting facilities" to "hedge" or "cover" unlawful betting at other places, or to bet stolen money, or otherwise to bring racing into disrepute.

Wagers were legal at common law. *LaFontaine v. Wilson*, 185 Md. 673, 678, 45 A. 2d 729, 162 A. L. R. 1218. In Maryland betting on horse races (including "Paris Mutual" pools) was not a crime at common law or until 1890 by statute. *James v. State*, 63 Md. 242, 247, 253, 254, 256, 265. In the *James* case four of the six judges who sat filed separate opinions, including Chief Judge Alvey and Judge Miller, both of whom dissented and held poolselling forbidden by Chapter 271 of the Acts of 1882. Mr. Edgar H. Gans, Assistant State's Attorney, and Attorney General Roberts (later a judge of this court) admitted, and three of the four opinions stated (and the fourth did not question), that betting on horse races was not a crime at common law. Since 1890 betting on a horse race, except within the ground of the race course, has been prohibited. Acts of 1890, ch. 206; 1894, ch. 232; 1898, ch. 285; 1920, ch. 273; Code, Art. 27, secs. 291-295; Art. 78B. The Act of 1898, sec. 124A, Art. 27, sec. 291, prohibits betting on a horse race, but sec. 124B, Art. 27, sec. 292, excepted betting within the ground of any race course licensed under section 124C, Art. 27, sec. 293. In *Close v. Southern Maryland Agr. Ass'n*, 1919, 134 Md. 629, 108 A. 209, the licensing provisions of the Act of 1898 were held unconstitutional. The original Racing Commission Act of 1920, ch. 273, sec. 10, Art. 78B, sec. 10, expressly provided that a license from the commission should be in substitution for a license under the Act of 1898. This mention of the Act of 1898 was omitted when section 10 was amended by the Act of 1947, ch. 502. See also, as to betting on horse races, *Clark v. Harford Agricultural & Breeding Ass'n*, 118 Md. 608, 621, 85 A. 503; *Agricultural Soc. of Montgomery County v. State*, 130 Md. 474, 480, 481, 101 A. 139; *Noland v. State*, 157 Md. 332, 334, 336, 146 A. 268. In *Nolan v. State* the court said that the Act of 1920 "created a com-

mission known as the 'Maryland Racing Commission', which was thereby authorized to issue licenses to 'any person or persons, association or corporation desiring to conduct racing within the State of Maryland,' who had complied with the provisions of the act, and was passed in substitution for the four last sections of chapter 285 of the Act of 1898 (Sections 248 to 251, inclusive, of the Code of 1924), as those sections, authorizing the court to issue such licenses, had been declared unconstitutional. It is true that it goes more into detail as to matters of regulation, but, with the exception of creating a commission, it is no more comprehensive in its scope than the sections for which it was substituted, and it is clear, we think, that it was not the intention of the Legislature in its passage to repeal section 247 of article 27 of the Code. * * * The object and purpose of the enactment of 1920 was to create, in substitution for the court, a board or body authorized to issue the licenses mentioned in the act, and to supervise and regulate the licensees in their management and conduct of the races, and to permit betting thereat, under the conditions imposed." 157 Md. at page 336, 146 A. at page 269.

Amendments to the Act of 1920 have gone still "more into detail as to matters of regulation", but have not changed the nature and purpose of the act from licensing and regulation of a private business to creation and management of a public business—from licensing racing, regulating the licensees in their management of the races, and "permit[ting] betting thereat, under the conditions imposed", to making betting a right of citizenship. Racing indeed is not "a strictly private business". It is a minutely regulated, heavily taxed business in which private rights and responsibility have not been wholly extinguished. *Mahoney v. Byers,* 187 Md. 81, 48 A. 2d 600, 603; *Brann v. Mahoney,* 187 Md. 89, 48 A. 2d 605. The commission has power "to prescribe rules, regulations and conditions under which all horse races shall be conducted"; and "may make rules governing, restricting or regulating betting on such races". Sec. 11. By

other provisions of the law certain licenses confer "betting privileges" on the licensees. The law protects bettors against fraud or extortion and by recent amendments requires each licensee, "as agent of the Commission," to make certain deductions from money wagered, to create a fund to be expended, with the permission of and upon conditions prescribed by the commission, for improvements which will "promote the safety, convenience and comfort of the racing public and of horse owners generally". Sec. 11A, Acts of 1947, ch. 502. But the law confers no personal right on individuals to attend or bet at race meetings. If it empowers the commission to require licensees to admit all comers "as spectators and bettors" unless excluded for good cause (as to which we intimate no opinion), the commission has not done this by implication by Rule 226.

Licensing, regulation and taxation of a private carrier do not make it a common carrier. *Rutledge Co-Op. Ass'n v. Baughman,* 153 Md. 297, 300, 301, 138 A. 29, 56 A. L. R. 102; *Continental Baking Co. v. Woodring,* 286 U. S. 352, 364, 52 S. Ct. 595, 76 L. Ed. 1155, 81 A. L. R. 1402.

As was said in the *Madden* case, "Plaintiff's argument results from confusion between a 'license', imposed for the purpose of regulation or revenue, and a 'franchise'. * * * Observing, * * * that the conduct of races for stakes had long been declared illegal 'except as specially authorized,' plaintiff argues from that that the license was in effect a franchise, since it granted a privilege not previously enjoyed by common right. That, though, overlooks the fact the privilege of conducting horse races for stakes does exist at the common law, that it is taken away only by statute, and that the statute's prohibition is removed only under certain circumstances and upon compliance with specified conditions. See *Corrigan v. Coney Island Jockey Club, supra; cf. Marrone v. Washington Jockey Club, supra; Western Turf Ass'n v. Greenberg,* 204 U. S. 359, 27 S. Ct. 384, 51 L. Ed. 520. Consequently, the license, instead of creating a privilege, merely permits the exercise of one restricted and regulated by

statute. In short, plaintiff's asserted right [to admittance] must rest either upon common law or upon statutory provision. No such right existed at common law, and the Legislature has not chosen to create one. Civil Rights Law, §§ 40, 40-b." 72 N. E. 2d at pages 699, 700. This view of the common law and New York racing legislation, we think, is applicable in Maryland to the common law and the Racing Commission law.

*Decree affirmed, with costs.*