Dear Delegate Bozman:
You have asked for our opinion about the legality of a proposed sweepstakes, based on a race to be held at Bally's at Ocean Downs ("Ocean Downs"), a harness race track in Worcester County. Half of the proceeds would benefit Atlantic General Hospital. Our opinion is that the sweepstakes would be unlawful.
 I Introduction
We understand the proposal to be as follows: The sweepstakes would be conducted by Ocean Downs, and would involve selling tickets with numbers representing all of the possible combinations of orders of finish in a race with nine horses. The winner would be based on the order of finish in a race run for that purpose.[1] Each ticket would cost ten dollars. Assuming that all of the tickets are sold, the gross generated would be $3,628,800. Of this sum, the winner would be allocated $1,000,000; the hospital, $1,814,400; the purse account for the races, $300,000; Ocean Downs, for capital improvements, $250,000; advertising and printing, $100,000; and "miscellaneous," $164,000.
Gaming in Maryland is prohibited by a variety of statutes found in Article 27 of the Maryland Code. Section 237 prohibits the keeping of a gaming table, or a house, vessel, or place for the purpose of gambling. Section 240 prohibits book making, pool selling, and betting on the results of "any trotting, pacing or running race of horses or other beasts, or race, contest or contingency of any kind." Section 356 provides that no person "shall draw any lottery or sell any lottery ticket" or "sell what are called policies, certificates or anything by which the vendor or other person promises . . . that any particular number, character, ticket, or certificate shall in any event or on the happening of a contingency entitle the purchaser . . . to receive money, property or evidence of debt."
The proposed sweepstakes would violate one or more of these prohibitions and is therefore invalid, unless it is authorized by some other provision of law. Two possible sources for authority to conduct the sweepstakes are the Maryland Horse Racing Act, which permits licensed horse tracks to conduct gaming in some circumstances, and Article 27, § 251B, which permits certain types of charitable gaming in Worcester County. It is our view, however, that neither of these laws authorizes the sweepstakes in question.
 II Horse Racing Act
Under the Maryland Horse Racing Act, a person "must have an appropriate license whenever the person holds a race meeting in the State where pari-mutuel betting is allowed or a purse, reward or stake is offered." § 11-302 of the Business Regulation ("BR") Article. The Act gives the Maryland Racing Commission broad authority to regulate racing and betting on racing in the State. BR, § 11-210(a)(1). See Lussier v. Maryland Racing Commission,343 Md. 681, 688, 684 A.2d 804 (1996). One exception to the Commission's plenary authority, however, is that it may not by regulation allow a form of intertrack betting, off-track betting, or telephone betting that is "currently unauthorized." BR, § 11-210(b)(2). These provisions, together with the rest of the Act and the legislative history of the laws regulating racing and wagering on it, evidence a legislative goal to restrict the gambling that may be conducted by a licensed track. Among the restrictions are that the permitted wagering generally must occur at or through the track and that the wagering is limited to pari-mutuel wagering.
Racing has been conducted in Maryland since earliest colonial times, and the first sanctioned racing began in 1743 with the founding of the Maryland Jockey Club at Annapolis. Hickey, TheThoroughbred: Maryland's Heritage, in Virginia Geiger (ed.),Maryland, Our Maryland, at 255 (1987). Gaming and betting on horse races were not prohibited at common law unless they created a public nuisance. Bender v. Arundel Arena Inc., 248 Md. 181,188, 236 A.2d 7 (1967); Greenfeld v. Maryland Jockey Club,190 Md. 96, 103, 57 A.2d 335 (1948). The forerunner of § 237, which prohibits gaming tables, was enacted in 1797, Chapter 110 of the Laws of Maryland 1797, but this provision was held not to reach book making and pool selling. James v. State, 63 Md. 242 (1885). The provision was held to apply to the sale of lottery tickets, however, where the winner was to be determined on the basis of race results. Boyland v. State, 69 Md. 511, 16 A. 132 (1888). In 1890, the General Assembly reacted to the holding in James by outlawing betting, book making, and pool selling on races, except on the grounds of the tracks where the races were held. Chapter 206 of the Laws of Maryland 1890. Subsequent legislation limited the tracks to meets of thirty days a year and required not only that the betting be done at the track where the race was run but also that it occur on the day that it was run. Chapter 232 of the Laws of Maryland 1894.
Abuses under this law, including the establishment of six tracks in a single county, so that wagering could be conducted six months out of every year, lead to amendments in 1898 requiring that the tracks obtain a license from the circuit court of the county in which it was located in order to be able to have legal betting on its grounds. Chapters 285 of the Laws of Maryland 1898. See Agricultural Society of Montgomery County v. State,130 Md. 474, 101 A. 139 (1917). The licensing provisions of this law were found invalid in Close v. Southern Md. Agric. Ass'n.,134 Md. 629, 108 A. 209 (1919), but the general prohibition on book making and pool selling remained in place. In 1920, under pressure to eliminate legal racing altogether, the General Assembly moved to fill the gap left by the decision in Close and created the Maryland Racing Commission to license and regulate racing. Chapter 273 of the Laws of Maryland 1920. This provision was expressly held not to repeal the general prohibition on pool selling and book making, but to continue the exception that had allowed these activities only on the grounds of licensed tracks where the race was run. Greenfield v. Maryland Jockey Club,190 Md. at 96; Nolan v. State, 157 Md. 332, 146 A. 268 (1929).
Since Greenfield and Nolan, the General Assembly has amended the Horse Racing Act often, but it has never made any changes suggesting that the power of the tracks to conduct wagering extended to other sites. In fact, the General Assembly has underscored this limitation by expressly authorizing certain forms of off-track betting and telephone wagering and denying the Racing Commission the discretion to add others.
The express authority for the Racing Commission to license tracks to conduct harness racing was first enacted in Chapter 502 of the Laws of Maryland 1947. Section 16, which was added to the Horse Racing Act by that law, provided that: "Each licensee licensed under the provisions of this Section shall at its option be permitted to avail itself of the pari-mutuel betting privileges heretofore granted in this Article," subject to the limitation that not more than one license with parimutuel betting privileges could be issued in a single county. The law provided that the track could retain six percent of the money wagered for its own use, together with the breakage, and that it was to pay a State tax of four percent on money wagered plus a license fee of $25 per day. A 1951 amendment, Chapter 696 of the Laws of Maryland 1951, further emphasized that the betting authorized by the provision is parimutuel wagering. Chapter 696 amended the first sentence of § 17 to provide that "the Commission is authorized in its discretion to issue licenses for the holding of trotting and pacing meetings at which there may be offered stakes, purses or awards, and at which there may be exercised pari-mutuel bettingprivileges." (Emphasis added.) This language remained in the Act until it was revised in 1992. While the revision did not retain the express authorization to conduct pari-mutuel wagering, the Revisor's Note made clear that the intent was not to alter that authority. General Revisor's Note to Article, Business Regulations Article at 666. See Nationwide Mutual Ins. Co. v.United States Fidelity Guar. Co., 314 Md. 131, 147, 550 A.2d 69
(1988). Moreover, the new language contains nothing that could be construed to grant authority for other kinds of wagering, and the law reflected in the revision contains a complex system under which the proceeds of wagering, including the mutuel pools, are divided among the tracks, the State, and various other entities involved in standardbred racing.[2] These provisions would be meaningless if the tracks could simply conduct some other form of wagering in which there would be no breakage, and money would not go into the mutuel pool.
Therefore, we conclude that the Horse Racing Act permits the tracks to conduct pari-mutual wagering only. If the proposed sweepstakes is to be permitted, the legal basis must be found elsewhere.
 III Charitable Gaming in Worcester County
A. Scope of Authorization
Article 27, § 251B authorizes the County Commissioners of Worcester County to issue a permit to certain organizations to "conduct a fund-raising affair at which merchandise or cash prizes may be awarded by devices commonly known as paddle wheels, wheels of fortune, chance books, raffles, or by any other gaming device." § 251B(a)(2). The permissible groups are a county or municipally supported volunteer fire company or auxiliary; a nationally chartered veteran's organization; a bona fide religious organization; a fraternal, educational, civic, patriotic, or charitable organization raising money for a charity in Worcester County; or a nonprofit organization raising money for an exclusively charitable, athletic, or educational purpose. Id.
Ocean Downs evidently does not meet any of these qualifications and therefore could not conduct the proposed sweepstakes.
Even assuming, however, that a qualified organization conducted the sweepstakes, it is our view that this type of gaming is not permitted by § 251B. The proposed sweepstakes is not a paddle wheel, wheel of fortune, or chance book. Whether it might qualify as a raffle, or as "any other gaming device," requires further analysis.
B. "Raffle"
Article 27, § 251B(a)(1)(iii) defines "raffle" as "a lottery using paper chances in which prizes are won by persons who buy chances in the lottery." This provision unquestionably creates an exception to the general prohibition on lotteries in § 356.American Legion, Clopper Michael Post # 10, Inc. v. State,294 Md. 1, 8, 447 A.2d 842 (1982). Moreover, if the definition were all that the General Assembly meant when it enacted the term "raffle," the proposed sweepstakes would be a "raffle," for it is undoubtedly a "lottery using paper chances in which prizes are won. . . ."See Boyland v. State, 69 Md. at 512.
Yet, we find it difficult to believe that, when the General Assembly authorized "raffles," it intended to allow any and all types of lotteries.[3] Had it so intended, presumably it would have authorized "lotteries," not "raffles." Moreover, we are enjoined to construe § 251B, like other provisions relating to gambling, "liberally, so as to prevent the mischiefs intended to be provided against." § 246.
The better reading of § 251B, in our view, is that the General Assembly authorized only those lotteries that present features characteristic of a raffle. One court, reflecting common usage, has described this kind of lottery as one "wherein a prize is awarded to the person holding the ticket, the number or name upon which corresponds to that on the counterfoil or ticket stub drawn at random from a container in which have been placed the stubs of all the tickets distributed." United States v. Baker,364 F.2d 107, 111 (3d. Cir.), cert. denied 385 U.S. 986 (1966). The proposed sweepstakes would not fit within the common understanding of a raffle.
We acknowledge that our interpretation of this provision is not free from doubt. Should the promoters of the sweepstakes find a qualified organization to conduct it and desire to proceed on the theory, contrary to our opinion, that the sweepstakes is a "raffle," the promoters would be well advised to discuss the issue with the State's Attorney for Worcester County. Of course, the General Assembly could also clarify the statute one way or the other, so that the legislative objective may be discerned with greater confidence.
C. "Gaming Device"
The cases that have considered the issue of what is a "gaming device" or a "gambling device" seem to agree that these terms refer to a machine or apparatus upon which a game is played. To meet this definition, the machine or apparatus itself must, by its operation, determine whether the player is the winner of a prize.State v. Ferris, 284 A.2d 288 (Me. 1971); Petition of DistrictAttorney, 644 A.2d 240 (Pa.Cmwlth. 1994); Commonwealth v.Mihalow, 16 A.2d 656, 659 (Pa.Sup. 1940) ("A `device or apparatus for gambling' is a device or apparatus designed for carrying on the actual gambling — for determining whether the player is to win or lose, like the wheel of fortune . . . and contrivances of that sort.") (citation omitted). These cases have concluded that a horse race is not a gaming device. State v. Shaw, 39 N.W. 305,307 (Minn. 1888); Commonwealth v. Mihalow, 16 A.2d at 659; In reTeletype Machine No. 33335, 191 A. 210, 212 (Pa.Sup. 1937).
In Maryland, it has been held that a blackboard and other materials used to facilitate betting on horses are not "gaming tables," because that term, like the term "gaming device," requires the playing of a game of chance. James v. State,63 Md. at 251. Maryland law also distinguishes between gambling games and gaming tables, on the one hand, and schemes of lottery, on the other. Bender v. Arundel Arena, 248 Md. at 189-90. The first involve activities in which the player participates personally and directly and is present when the game ends and the result becomes known, while the second covers schemes for awarding a prize by lot or chance in which the only direct or personal participation by the seeker of the prize is his purchase of a ticket or its equivalent. Id. As discussed above, the proposed sweepstakes is a form of lottery in which the winner is determined by the order of finish in a horse race. As such, it is not a gaming table, nor does it meet the definition of gaming device, and it is not authorized by § 251B.[4]
 IV Conclusion
In summary, it is our opinion that the proposed sweepstakes would violate Maryland law.
Very truly yours,
 J. Joseph Curran, Jr. Attorney General
 Kathryn M. Rowe Assistant Attorney General
_____________________ Jack Schwartz Chief Counsel Opinions and Advice
[1] Apparently three races would be designated in advance for the sweepstakes. If all three races were conducted without problems, the results of one of the three, drawn by lot, would become the sweepstakes event.
[2] See BR, § 11-613(a)(2)(ii) (half of the breakage to Sires Stakes Program at track with average handle over $150,000), 11-614(2) (0.25% of mutuel pool to the Maryland Harness Track Employees Pension Fund at tracks with average handle over $300,000), and 11-615(a) (percentage of mutuel pool to Sires Stakes Program and the Foaled Stakes Program of the Maryland Standardbred Race Fund).
[3] The legislative history of the provision, Chapter 463 of the Laws of Maryland 1988, contains fragmentary evidence that the General Assembly intended simply to authorize a greater number of what are conventionally understood as raffles, but the history as a whole is inconclusive.
[4] In light of our conclusion, we need not consider the effect of other provisions of § 251B — for example, the requirement in § 251B(e) that the fundraiser be conducted on property owned or leased by a qualified organization or in an approved public place.
 *Page 100