## SOUTHERN MARYLAND AGRICULTURAL ASSOCIATION OF PRINCE GEORGE'S COUNTY ET AL. *v.* MAGRUDER, RECEIVER, ET AL.

[No. 176, October Term, 1950.]

*Decided June 15, 1951.*

The cause was argued before MARBURY, C. J., and COLLINS, GRASON and HENDERSON, JJ., and GRAY, JR., J., Chief Judge of the Seventh Judicial Circuit, specially assigned.

*Simon E. Soboloff* and *Hyman Ginsberg,* with whom were *Ginsberg & Ginsberg* on the brief, for the appellants.

*Richard W. Emory* and *Hilary W. Gans* for the appellees.

GRAY, JR., J., by special assignment, delivered the opinion of the Court.

This appeal is from *ex parte* action of the Circuit Court for Prince George's County in appointing a receiver and granting an ancillary injunction in aid thereof. The bill was filed by several persons who claimed an interest in the defendant Corporation by reason of stock ownership therein, or as beneficial owners of its stock, or as fiduciaries controlling such stock. The order appointing the receiver was passed without notice to the defendant Corporation, and without any hearing with respect to the application.

This action by the chancellor constituted one of the most drastic remedies known to our practice. Ordinarily, before the assets of a party defendant would be seized in receivership, there should be a *nisi* order, or some opportunity should be afforded for a hearing by the adverse party. The question presented by this appeal is whether the facts set forth in the bill presented a situation of such acute hazard to the defendant Corporation and those interested therein, including the plaintiffs, as to justify the drastic remedy employed in this case.

This court said in the case of *Steel's Department Stores, Inc. v. Buckingham*, 143 Md. 680, 123 A. 391, 392, that: "The peremptory and *ex parte* appointment of a receiver may be one of the harshest and most drastic of legal remedies. To deprive an unwilling person of a valuable business or property, and place it in the hands of a stranger, may result in irreparable loss and irremediable wrong. * * * And in *Miller's Equity*, sec. 630, it is said: 'There are few powers exercised by a court of chancery which require greater caution than the power of appointing receivers. It is a discretionary power, and a delicate one, to be exercised with great circumspection, and only under special and peculiar circumstances requiring summary relief. It is a high power, never exercised where it is likely to produce irreparable injustice or injury to private rights, or where there exists any other safe or expedient remedy. In the exercise of a jurisdiction so summary in its character, and which deprives one of his property without a hearing, upon a mere *ex parte* application, courts cannot be too cautious, otherwise an injury may be done the defendant in many cases, for which the subsequent restoration of the property may afford no adequate compensation."

The bill concedes that the Corporation is solvent and has ample assets to meet its obligations, but charges "certain officers and directors" with mismanagement of the business of the Corporation, and misapplication of its assets. It is alleged that the acts of mismanagement include "illegal and unlawful activities in violation of the Laws of Maryland, and the rules, regulations, and orders of the Maryland Racing Commission." It also alleges the election of unauthorized officers and the payment of improper salaries. There is a further allegation that the Corporation's monies have been misspent and misappropriated. It is also alleged that the Corporation is required to make an important business decision having to do with the purchase of the Havre de Grace race track. These allegations are of such a character and are couched in such general terms that, standing alone, there is grave

question whether they would suffice to justify the drastic action taken by the chancellor. However, there is the further allegation that because of the alleged illegal and unlawful activities, the Maryland Racing Commission had concluded to withhold the allocation to the defendant Corporation of dates upon which it might conduct its normal spring racing season for 1951, unless a change of management were effected. It is this decision by the Racing Commission which presents the real emergency with which the chancellor was called upon to deal.

After the order of court appointing the receiver, the defendant corporation filed an answer, which was adopted by the individual parties defendant. Thereupon the individual defendants appealed. Section 31, Article 5, of the Code. This answer denies many of the relevant allegations of the bill and sets up other matters in defense of the suit. Much of defendants' brief is devoted to a demonstration that this answer destroys the equities of the bill. However, this answer was not before the chancellor when the order appealed from was passed, and cannot be considered by this court. The court is limited to the question of whether the bill and exhibits justified the passage of the order appealed from. *Blackburn v. Craufurd,* 22 Md. 447; *Baltimore Skate Mfg. Co. v. Randall,* 112 Md. 411, 76 A. 491; *State Founders, Inc. v. Oliver,* 165 Md. 360, 169 A. 59; *Sterbach v. Robinson,* 148 Md. 24, 128 A. 894. Accordingly, for purposes of this appeal, this court is bound to accept as true all facts properly alleged in the bill and exhibits.

A perusal of the relevant Maryland statutes will demonstrate that the General Assembly has established a broad policy of prohibiting the commercial exploitation of the public's gambling instinct. Article 27, Sections 288 to 301, inclusive. *Gaither v. Cate,* 156 Md. 254, 144 A. 239. The Legislature has deviated from this policy by the exception in favor of betting at race tracks provided in Section 292, and by the enactment of Article 78B. This statute permits the operation of race tracks at which horse racing, with attendant betting, is allowed

under very close regulation and supervision. The Maryland Racing Commission is given exceedingly wide and comprehensive regulatory powers. Examination of the 3rd Interim Report of the Kefauver Committee of the United States Senate demonstrates the wisdom of the Legislature in thus providing adequate controls where it determines that the anti-gambling laws are to be relaxed. Section 10 of Article 78B not only authorized the Commission to withhold the award of any days to an applicant for racing privileges, but to suspend or revoke its license for any cause. Section 11 empowers the Commission to require the removal of any employee or official employed by any licensee. It is apparent that the Legislature deliberately imposed grave responsibility upon the Racing Commission in order that this exception to the anti-gambling laws of the State be kept within proper limits.

After reciting that various officers and directors of the defendant Corporation had been guilty of mismanagement, including illegal and unlawful activities, the bill, in Paragraph 14, alleges that the Racing Commission, after having made an investigation of these activities, had referred the matter to the State's Attorney for Prince George's County "for possible criminal action" and had "informally advised the complainant stockholders that it will under no circumstances renew the Corporation's racing license unless a new general manager is elected and there is a general house-cleaning of its affairs." There is the further allegation that the Commission likewise informed the complainants that such license would be withheld if Josephine M. O'Hara continued to act as president of the Corporation. The bill then continues with the allegation that the Racing Commission has advised the complainants that a new management, particularly a new general manager, must be elected forthwith, because the Commission is about to select racing dates in which the Corporation would normally expect to participate. There is the further allegation that the Commission also informed the complainants.

that it "cannot act on the Corporation's application for dates unless and until it knows what steps have been taken to free the Corporation from the gross mismanagement of its business, and the illegal activities that certain officers and directors have heretofore permitted."

Faced with this ultimatum by the State Racing Commission, the complainants were confronted with the necessity for a reorganization of the defendant's corporate management, or sustaining the loss by the defendant of its franchise to conduct racing operations for the year 1951. These operations obviously constitute the life blood of the Corporation, and the threat by the Racing Commission made it imperative that action be taken forthwith.

Ordinarily, this action would be sought at a regular or special meeting of the stockholders of the company, and certainly a court would not be justified in intervening if the normal corporate processes could effectively function. The stock of the defendant Corporation consists of 11,682 shares, of which 7,832 shares are deposited with the Safe Deposit & Trust Company under a voting trust agreement, a copy of which is exhibited with the bill. The bill alleges that the plaintiffs own legally, beneficially, or that they represent, 6,487 shares, something more than a majority of the outstanding stock, and that of this number, 3,406 shares are on deposit under the voting trust agreement. Under the terms of this agreement, the 7,832 shares, well over a majority, must be voted jointly by Joseph A. Farrell and Josephine M. O'Hara, or their proxies. The trust agreement provides that upon the death of either of these trustees, he or she may name a successor to vote in his or her place and stead. The bill alleges that Joseph A. Farrell is now deceased, and by his will, copy of which is exhibited with the bill, has named John W. Farrell and John B. Farrell to join with Josephine M. O'Hara in voting the deposited stock. The bill alleges that John W. Farrell and John B. Farrell are unable to agree between themselves, or with Josephine O'Hara, concerning the voting of such

stock for the election of directors, the election of a general manager, or any other matter requiring the vote of the stockholders of the Corporation, and that such impasse appears to be beyond any hope or expectation of an agreement among said three persons. The by-laws of the Corporation require that various officers, including the general manager, who seems to have been the chief target for criticism by the Racing Commission, must be elected by the stockholders. It is urged on behalf of the appellants that there is no allegation in the bill that O'Hara and the two Farrells have met and even tried to agree. The court is not impressed with this argument in the teeth of the direct allegation that they cannot agree with respect to a matter concerning which immediate agreement is imperative if the business of the corporation is to go forward. It is also contended on behalf of the appellants that it is possible to resolve the deadlock among the trustees empowered to vote the stock by applying to some court to appoint an umpire under Section 26 of Article 23 to resolve the differences of opinion between the two Farrells, and, if an agreement could not then be reached with Josephine M. O'Hara, then a like application could be made for an umpire to resolve that difference of opinion. Assuming without deciding that such a conflict could be thus resolved, a mere statement of the proposition demonstrates that it could not be expected to be resolved in time to enable the Corporation to meet the deadline set by the Maryland Racing Commission.

When this bill was presented to the chancellor, he was confronted with the fact that an administrative decision had been made by the Maryland Racing Commission, acting within the authority committed to it by the relevant statute, which would utterly destroy a valuable franchise theretofore enjoyed by the Corporation, unless its corporate management be placed in hands acceptable to the Racing Commission. The bill demonstrated that a majority of the stock of the Corporation was hopelessly entangled by the voting trust because of differences

of opinion among the three voting trustees. The chancellor was justified in drawing the inference that if he did not place the affairs of the defendant Corporation in receivership, it would be awarded no racing dates for the year 1951, its plant lie idle for a year, its good will be dissipated, and its prospect of earnings for the year be foreclosed.

Counsel have referred to no case in this court where a receiver has been appointed to resolve a deadlock in the management of a corporation, and the court has found none. However, there is ample authority elsewhere for this course. 19 C. J. S., p. 1173, Sec. 1467. *Fletcher, Cyclopedia of the Law of Private Corporations,* (1942 Ed.) Vol. 16, p. 127, sec. 7713; *Sternberg v. Wolff,* 56 N. J. Eq. 389, 39 A. 397, 39 L. R. A. 762; *Masters v. Hartmann,* 45 App. D. C. 253; *Saltz v. Saltz Bros., Inc.,* 65 App. D. C. 393, 84 F. 2nd 246; *Misita v. Distillers Corp., Ltd.,* 54 Cal. App. 2nd 244, 128 P. 2nd 888. There is no reason why a receivership should not be used in a proper case to break a deadlock in the management of a corporation where no other adequate remedy is available to those who would otherwise sustain substantial loss.

The bill makes it abundantly clear that no delay could be tolerated, and, in order for any action by the chancellor to be effective, it would have to be taken quickly. If the chancellor passed a *nisi* order on the bill, he would be certain to invite an answer and necessitate a hearing. It seems obvious that such a hearing could not be concluded in time to afford the immediate relief which was so imperative. To have set the application for the appointment of a receiver down for hearing, and provided for notice to the parties concerned, would have furnished no better solution. Ordinarily, one or the other of these two methods of dealing with an *ex parte* application for a receiver, or for an injunction, is preferable to the passage of the order merely upon presentation of the bill. However, in this case the prompt resolution of the conflict between the stockholders with respect

to meeting the requirements of the State Racing Commission was so important as to justify the drastic action which was taken by the chancellor.

It is urged on behalf of the appellants that at least some of the parties plaintiff have no standing to bring this suit. Without attempting to analyze in detail the rights of the respective parties to the stock with respect to which they act, suffice it to say that the court finds that at least some of the plaintiffs are fully authorized to protect their stock interests in the Corporation by prosecuting this suit. It is urged on behalf of the appellants that before any plaintiff could assert the rights with respect to stock claimed by him, he must exhibit to the court his stock certificate as the best evidence of his right and title, citing the case of *Steel's Department Stores, Inc. v. Buckingham,* 143 Md. 680. The plaintiffs, however, have filed with their bill the voting trust agreement which recites that the certificates for 3,406 shares of their stock have been deposited with the Safe Deposit & Trust Company. Manifestly this is a sufficient explanation why their stock certificates have not been produced, and we think it is adequate to satisfy the court *prima facie* that the plaintiffs do in fact own or control sufficient of the defendant's stock to authorize them to protect their interest by this suit.

*The order appealed from is affirmed with costs.*