In re William G. CHRISTMAS, Debtor.

William G. CHRISTMAS, Plaintiff,

v.

MARYLAND RACING
COMMISSION, Defendant.

Bankruptcy No. 88–5–3712–JS.
Adv. No. A88–0379–JS.

United States Bankruptcy Court,
D. Maryland.

June 15, 1989.

Joseph A. Imbesi, Baltimore, Md., for plaintiff.

Bruce C. Spizler, Asst. Atty. Gen., Dept. of Licensing & Regulation, Baltimore, Md., for defendant.

MEMORANDUM OPINION DENYING DEBTOR'S AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

JAMES F. SCHNEIDER, Bankruptcy Judge.

The issues before the Court are whether the suspension of a debtor's license as a horse trainer by the Maryland Racing Commission constitutes discriminatory treatment prohibited by Section 525(a) of the Bankruptcy Code; whether the suspension violates the automatic stay provisions of Section 362(a); and whether the state regulations upon which the suspension was based are therefore unconstitutional as violative of the Supremacy Clause. Based upon the conclusions that the license was not suspended solely because the debtor had filed bankruptcy, and that the suspension of the license falls within an exception to the automatic stay, the complaint for declaratory and injunctive relief will be denied.

### PROLOGUE

"Horse racing, the sport for which Maryland is most widely known, had an early origin in the State, though the exact date of its introduction is not definitely known. A deed filed in 1695 says that a tract of land in Talbot County 'starts at the race course,' indicating that the colonial gentry followed the sport even before that date.

"The colonial track at Annapolis was under the auspices of the Maryland Jockey Club. Although this organization dates from 1745, Francis Barnum Culver, in his

*Blooded Horses of Colonial Days,* expressed the opinion that an organized racing association existed in Annapolis as early as 1740 or '43. The widespread interest in racing created an early demand for swifter strains of horses and the more common stock was soon replaced by pedigreed animals.

"Among the history-making blooded stock were Spark, imported by Governor Ogle; Governor Horatio Sharpe's Othello; the brood Queen Mab (out of the royal stud at Hampton Court); Colonel Tasker's importation, Selima, and Samuel Galloways's famous Selim, son of Othello and Selima. Arriving from England in 1780, Selima was destined to be one of the most important sources of thoroughbred blood in the country. To Selima many great horses, such as Man o' War, Seabiscuit, and War Admiral trace their pedigrees.

"The Revolution brought horsebreeding and racing to a standstill in Maryland. Fully half a century later, when Baltimore had superseded Annapolis as the metropolis of Maryland, a new track, the Baltimore Central Course, was established on a plateau near the Old Frederick Road, not far from the present Franklintown. About sixty horses took part in the opening meet which was held late in October 1831.

"Today there are four one-mile tracks in Maryland. Pimlico, the oldest (1870) and the most famous of the four, is one of the country's major tracks. 'Old Hilltop,' as it is known to the racing fraternity, is a semi-annual rendezvous for famous horses and distinguished guests. The outstanding racing classic at Pimlico is the Preakness, second only to the Kentucky Derby in popularity and first in traditional background.

The winner of the event is awarded the Woodlawn Vase in addition to a substantial purse. The trophy was created by Tiffany in 1860 on the order of Colonel R.A. Alexander of Woodlawn, Kentucky.

"The other Maryland mile tracks are Havre de Grace, Bowie, and Laurel. In addition there are five half-mile courses— Marlboro, Timonium, Belair, Cumberland, and Hagerstown." [1]

## FINDINGS OF FACT

1. The debtor, William G. Christmas, has been a licensed horse trainer in Maryland and several other states for approximately 40 years. He serves as president and resident agent, as well as one of three directors, of the Maryland Sales Agency, Inc. ["M.S.A."], and with his wife is the owner of between 80% and 90% of the corporate stock. M.S.A. is a Maryland corporation whose primary purpose is the sale of horses. The headquarters of the corporation is located at the Idle Miss Farm, in Monkton, Baltimore County, Maryland, which is also the debtor's residence.

2. On October 13, 1988, the Stewards at Laurel Race Course suspended Mr. Christmas' license as a horse trainer upon a finding that he was "financially irresponsible." The suspension arose because the Stewards learned about a judgment obtained against M.S.A. in the amount of $16,219.65.

3. This action was taken pursuant to the Maryland Racing Commission Thoroughbred Rules which govern horse racing in Maryland. Rules 10.01.25 and 10.01.57 which are found under Title 09 of the Code of Maryland Regulations ("COMAR") contain the licensing requirements and obligations of horse trainers.[2]

1. *Maryland, A Guide to the Old Line State,* Writer's Program of the W.P.A. in the State of Maryland, 1940, p. 118.

 Of the nine race tracks in existence in 1940, three are in active use today for thoroughbred horse racing, namely Pimlico, Laurel and Timonium.

2. Rule 10.01.25 Licenses, Registrations, and Fees for Participants in Racing.

 A. The following persons shall be required to take out a license from the Commission, and the annual fee shall be as follows:

| | |
|---|---|
| (1) Owner (original) | $25 |
| (2) Owner (renewal) | 10 |
| (3) Trainer (original) | 15 |
| (4) Trainer (renewal) | 10 |
| (5) Assistant Trainer | 10 |
| (6) Jockey | 10 |
| (7) Apprentice Jockey | 10 |
| (8) Authorized Agent | 5 |
| (9) Jockey Agent | 10 |
| (10) Pari–Mutuel Employee | 2 |
| (11) Stable Employee | 2 |
| (12) Track Employee | 2 |
| (13) Vendor | 2 |

(14) Veterinarian ..................... $10
(15) Farrier ......................... 5
(16) Maintenance ..................... 2
(17) Caterer ......................... 2
(18) Stable Name:
 Annual ......................... $50

B. The Commission may refuse to issue or renew a license or may suspend or revoke a license issued pursuant to this section if it finds that the applicant, or any person who is a partner, agent, employee, or associate of the applicant:

(1) Has been convicted of a crime in any jurisdiction;

(2) Is associating or consorting with any person or persons who have been convicted of a crime or crimes in any jurisdiction or jurisdictions;

(3) Is consorting or associating with, or has consorted with, bookmakers, touts, or persons of similar pursuits, or has himself engaged in similar pursuits;

(4) Is financially irresponsible;

(5) Has been guilty of or attempted any fraud or misrepresentation in connection with racing, breeding, or otherwise;

(6) Has violated or attempted to violate any law with respect to racing, in any jurisdiction or any rule or order of the Commission;

(7) Has violated any rule of racing which has been approved or adopted by the Commission; or

(8) Has been guilty of or attempted any fraudulent or dishonest act in connection with his activities, responsibilities, or duties on the race track, or has engaged in conduct detrimental to racing.

C. The fee shall accompany each application for license or registration, which expires December 31st of the year of issue.

D. Badges. [omitted.]

Md.Regs.Code title 09, § 10.01.25 (1988).

Rule 10.01.57 Trainers.

A. Eligibility. A person may not be granted a trainer's license unless the person has:

(1) Been previously issued a trainer's license; or

(2) Satisfied all of the following requirements:

(a) Served a minimum of 2 years apprenticeship with a licensed trainer, of which time at least 12 months shall be at a track under the jurisdiction of a licensing body or recognized association;

(b) Submitted notarized statements from three licensed trainers containing their opinions as to the applicant's:

(i) Reputation,

(ii) Financial responsibility,

(iii) Qualifications to train;

(c) Passed a standard examination administered by the stewards;

(d) Passed a standard barn test administered by horsemen's representatives under the supervision of the stewards.

B. A person under 18 years old may not be granted a trainer's license.

C. Each trainer shall obtain a license from the Commission. Before issuance of a license, a trainer may be required to satisfy the Commission of his financial responsibility and shall maintain his financial responsibility so long as he is licensed by the Commission. A fee of $15 shall accompany each original application. The renewal fee is $10. If a renewal is not made after a period of 5 years, the applicant shall again apply and pay the fee of $15 for an original license. The Commission, after a period of 5 years, shall remove from its records the license card of the individual.

D. A trainer may not practice his profession except under his own name.

E. The stewards may permit a trainer to act, pending action on his application.

F. A licensed trainer may represent the owner in the matter of entries, declarations, and the employment of jockeys.

G. A trainer shall have his horse in the paddock at the time appointed.

H. A trainer shall attend his horse in the paddock, and shall be present to supervise his saddling, unless he has obtained permission of a steward to send his licensed assistant trainer or another licensed trainer as a substitute.

I. If a trainer, or owner engages two or more jockeys for the same race, he shall pay the losing fee for each engaged jockey not riding in the race, as well as the proper fee to the jockey who does ride.

J. A jockey's fee shall be considered earned when the jockey is weighed out by the clerk of the scales. The fee may not be considered earned if the jockey, of his own free will, takes himself off of his mount, when injury to the horse or rider is not involved. Any conditions or considerations not covered by the above ruling shall be at the discretion of the stewards.

K. A trainer shall be responsible for the condition of a horse trained by him.

L. Each trainer shall register with the racing secretary all the horses in his charge, giving the name, age, sex, color, and ownership of each, and shall immediately notify the racing secretary of any transfers to or from his badge list, and the disposition of the horses so transferred.

M. A trainer may not have in charge or under his supervision any horse owned, in whole or in part, by a disqualified person.

N. A trainer may not accept, directly or indirectly, any bribe, gift, or gratuity in any form which might influence the result of any race or which would tend to do so.

O. A trainer may not employ a jockey for the purpose of preventing him from riding in any race.

P. Substitute and Assistant Trainers.

(1) If a trainer is to be absent from the track where his horses are participating in races, he shall obtain a licensed trainer to substitute for him during his absence. The substitute trainer shall be approved by the

The suspension of Mr. Christmas' license as a horse trainer was based upon alleged violations of the financial responsibility requirements of Rules 10.01.25(B)(4) and 10.01.57(C). *Id.*

4. Mr. Christmas requested an evidentiary hearing before the Maryland Racing Commission which was initially scheduled to be held on December 14, 1988, but which was later postponed until December 21, 1988 at the request of Mr. Christmas' attorney.

5. On December 21, 1988, immediately before the hearing was held by the Commission, Mr. Christmas filed a Chapter 12 ("Family Farmer") bankruptcy petition in this Court (Case No. 88–5–3712).

6. The Commission conducted the evidentiary hearing on December 21, 1988 as scheduled. The debtor attended the hearing, was represented by counsel and participated in the hearing by giving testimony.

7. By written order the Commission upheld the Stewards' temporary suspension of the debtor's license based upon his failure to comply with the requirements of Rules 09.10.01.25(B)(4) and 09.10.01.57(C) until such time as he was able "to demon-

---

board of stewards upon forms approved by the Racing Commission. The original trainer is the absolute insurer of the horse he has entered. The substitute trainer will then become the absolute insurer of any additional horses he may enter.

(2) A trainer who has in his care a substantial number of horses, or who is actively participating in more than one race meeting at one time, may employ an assistant trainer with the approval of the stewards. Before the issuance of an assistant trainer's license, the applicant shall be required to comply with all the requirements prescribed for a person applying for a trainer's license. The assistant trainer shall be the absolute insurer of all horses that he may enter and is subject to all regulations prescribed by the Maryland Racing Commission. The name of the assistant trainer shall be shown on the official program along with that of the employing trainer.

Q. Trainers having charge, custody, or care of horses are obligated to protect properly the horses and guard against any violation of the Corrupt Practices Rules.

R. Trainers who make frivolous complaints may be fined or suspended by the stewards.

S. Any trainer or owner who harbors anyone not provided with a Maryland occupational license shall be immediately reported to the stewards, so they may make investigation thereof and take appropriate action as they deem necessary, if any, as provided under Regulations .45V.

T. Equal Effort for All Entries. Trainers shall instruct jockeys that all horses shall be ridden out in every race. If two or more horses run in one interest in any race, each jockey shall give his best effort.

U. Responsibility for Weight. A trainer is solely responsible for the weight to be carried by any horse he enters.

V. Occupying Stalls. Trainers may not occupy stalls at a track without written permission of the track management. Stall assign-ments shall be made for a fixed period of time, and shall be vacated at the end of that period.

W. Stalls are to be assigned by the Racing Association to trainers for horses of racing age (no yearlings) which comply with the Racing Association's published eligibility rule, except that the Racing Association may assign specific stalls for horses to be used as ponies. Stalls are to be for the sole use of the trainer to whom they are assigned. Falsification of stall applications and transfer or use of these stalls by any other person constitutes a violation of this rule and will be subject to fine or suspension.

X. Trainers shall have workmen's compensation insurance as required by Maryland law. A license may not be issued to a trainer unless he furnishes the Commission with the number, name of company, name of agent, and expiration date of his insurance policy, and a Certificate of Insurance verifying the coverage is attached to his application and on file with the Commission. Insurance coverage shall be in effect on the date the license is applied for. The licensee shall notify the Commission, in writing, of any termination of this insurance coverage during the term of the license, not less than 5 days before the effective date of termination and furnish the Commission with the specifics of replacement coverage, including a Certificate of Insurance, as required in this section for the initial coverage.

Y. When a groom or other employee of a trainer, working at one of the tracks, leaves the trainer's employ, the trainer shall promptly notify the security office of that track, in writing, of the employee's departure.

Z. A licensed trainer may not:

(1) Take or keep in his charge a horse owned wholly or in part, or controlled by, a person unlicensed as an owner;

(2) Assume responsibility for a horse not under his active care and supervision, except as provided by §§ H and P of this regulation. Md.Regs.Code title 09, § 10.01.57 (1988).

strate his financial responsibility and/or his financial viability." The Commission made a number of factual findings as part of its decision.[3]

3. [2.] ... The Respondent (as described by himself) is the "principal employee of the Corporation" who deals directly with horse breeders and race tracks....

[3.] A review of the files of the Baltimore County Circuit Court clerk's office revealed the following recorded liens against William G. Christmas personally:

Federal Tax Liens

| Date | File # | Amount |
|---|---|---|
| 4–29–88 | 70/196 | $ 9,706.73 |

Judgments

| Date | File # | Plaintiff | Amount |
|---|---|---|---|
| 1–22–80 | 17/155 | State of Md. | $ 826.38 |
| 6–16–80 | 18/289 | State of Md. | $ 1,154.27 |
| 7–13–87 | 87CG482 | Tamworth Ltd. | $26,000.00 |
| 8–6–87 | 118/182 | Thomas G. Harris | $ 240.00 |
| 1–14–88 | 87CG4812 | Lawrence Millison | $ N/A |
| 5–9–88 | 88CG2104 | William A. Purdy | $14,898.50 |
| 5–20–88 | 125/135 | Davis Fedder & Allen | $ 1,763.16 |
| 7–20–88 | 126/275 | Meeting House Farm | $ 2,578.80 |
| 10–20–88 | 88CG1322 | Garden State Race Track | $16,677.32 |

A review of the files of the Baltimore County Circuit Court Clerk's Office revealed the following reported liens and judgments against the Maryland Sales Agency, Inc.:

Federal Tax Liens

| Date | File # | Amount |
|---|---|---|
| 5–12–88 | 70/283 | $43,500.49 |

Judgments

| Date | File # | Plaintiff | Amount |
|---|---|---|---|
| 2–17–81 | 10682 | Fasig–Tipton Co. | $13,650.00 |
| 1–9–84 | 90/308 | Frank J. Fico | $ 5,000.00 |
| 7–5–85 | 40/138 | State of Md. | $ 530.70 |
| 6–13–87 | 87CG1954 | Lois Hyman | $ 6,460.00 |
| 7–13–87 | 87CG6482 | Tamworth Ltd. | $26,000.00 |
| 10–8–87 | 120/10 | Katherine G. Hardin et al | $ 4,750.00 |
| 10–8–87 | 120/11 | Peter Primani et al | $ 9,975.00 |
| 10–12–87 | 96CG2153 | Alma Dove Muden | $11,861.00 |
| 12–1–87 | 87CG4988 | Pedigree Asso., Inc. | $19,787.54 |
| 1–14–88 | 87CG4812 | J. Lawrence Mullison | N/A |
| 4–13–88 | 87CG4193 | Dulaney, Vernay Inc. | $20,495.75 |
| 4–14–88 | 87CG41922 | Uplan Park Stud et al | $14,730.00 |
| 4–22–88 | 61/115 | State of Md. | $ 1,526.52 |
| 5–9–88 | 88CG2104 | William Purdy | $14,898.50 |
| 5–20–88 | 125/135 | Davis Fedder & Allen | $ 1,763.16 |
| 7–1–88 | 62/100 | State of Md. | $ 127.88 |
| 7–20–88 | 126/275 | Meeting House Farm | $ 2,578.80 |
| 8–2–88 | 88CG1166 | David Gateb Advertising | $16,219.65 |
| 10–7–88 | 64/208 | State of Md. | $ 179.27 |
| 10–20–88 | 88CG1322 | Garden State Race Track | $16,677.32 |

The majority of the above-listed judgments, both individual and corporate, involve the sale of horses for racing purposes or otherwise.

[4.] The Commission suspended the trainer's license of the Respondent for brief periods on three occasions in 1987 and 1988: two incidences involving the Respondent's failure to maintain workmen's compensation insurance coverage and a separate incident of failing to satisfy a monetary judgment.

[5.] The Respondent filed a petition for personal bankruptcy (pursuant to Chapter 12 of the United States Bankruptcy Code) on or about December 20, 1988 (the day preceding

8. The Commission concluded as a matter of law that it was not precluded by either section 362(a)(1) or section 525 of the Bankruptcy Code from taking action against the debtor.[4]

9. Counsel for the Commission claims that M.S.A., the debtor's corporation, filed a voluntary Chapter 11 bankruptcy petition in this Court on December 21, 1988, after the hearing was conducted by the Commission. However, taking judicial notice of its own docket, the Court notes that M.S.A. filed a voluntary Chapter 11 petition here on June 5, 1989 (Case No. 89–5–1856–JS).

10. On December 29, 1988, the debtor filed in the instant adversary proceeding (Adv. No. A88–0379–JS) a "Complaint for an Ex Parte Injunction" against the Maryland Racing Commission. This Court denied the so-called "Order Granting Ex parte Injunction" [P. 2] by the following marginal notation:

Denied 1/5/89

The Complaint is improper as to form and fails to state a cause of action. This order fails to comply with the Federal Rules of Civil Procedure.

James F. Schneider, U.S.B.J.

*Order* dated January 5, 1989.

11. On January 20, 1989, the debtor filed the instant "Verified Amended Complaint and Request for Declaratory and Injunctive Relief" [P. 3], a "Motion for Preliminary Injunction and Temporary Re-straining Order" [P. 4] and a memorandum [P. 5]. This Court issued an Order [P. 6] directing the Maryland Racing Commission to show cause on or before February 8, 1989 why the requested relief ought not be granted. On February 8, 1989, the Commission filed its answer [P. 7] and a memorandum [P. 8].

## CONCLUSIONS OF LAW

1. In the leading case of *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971), the Supreme Court held invalid an Arizona statute under which the state suspended drivers' licenses held by a husband and wife based upon a lack of financial responsibility after they received a discharge in bankruptcy. The requirement of the law that tort judgments arising out of an automobile accident must be satisfied as a condition to operate a motor vehicle, regardless of the receipt of a discharge in bankruptcy, ran counter to the "fresh start" purpose of the former Bankruptcy Act of 1898, as amended. Therefore, the state statute in conflict with Federal bankruptcy legislation was declared to be unconstitutional in light of the Supremacy Clause. *U.S. Constitution*, Art. 6, cl. 2.

2. The result in *Perez* was codified in section 525(a) of the Bankruptcy Code, which further extended protection to debtors from governmental discrimination based solely upon the filing of bankruptcy.[5]

---

the hearing before the Commission), and planned to file a petition for bankruptcy of the Corporation (pursuant to Chapter 11 of the United States Bankruptcy Code) in the afternoon of the same date of the hearing before the Commission.

[6.] According to the Respondent, the debts of the Maryland Sales Agency, Inc., under his direction, total in excess of $1.8 million; however, the Respondent has re-payed [sic] some of these monies via personal loans which he, in turn, loaned to the Corporation to re-pay [sic] a portion of the said debts. *Order of the Maryland Racing Commission* dated January 13, 1989.

4. [2.] 11 U.S.C. § 525 does not preclude the Commission from suspending the trainer's license of the Respondent, in that, such action contemplated by the Commission is not based *solely* on the fact that the Respondent has filed for bankruptcy, and, as such, the action contemplated by the Commission is not dis-criminatory in violation of the said bankruptcy provision. *See, In the Matter of the Application of Curtis Taylor* [293 Or. 285], 647 P.2d 462 (Ore.1982); *In the Matter of the Application of William W. Gahan*, 279 N.W.2d 826 (Minn.1979).

[3.] 11 U.S.C. § 362(a)(1) does not automatically stay any action of the Commission in this matter, *viz. a viz.*, the Respondent filing a petition in bankruptcy. 11 U.S.C. § 362(b)(4) expressly provides for an exception to an "automatic stay" where a governmental unit is enforcing its regulatory power. Such is the case here.

*Id.*

5. § 525. Protection against discriminatory treatment

(a) Except as provided in the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. §§ 499a–499s), the Packers and Stockyards Act, 1921 (7 U.S.C. §§ 181–229), and section 1

3. However, the legislative history of section 525, as contained in the House and Senate reports, demonstrates the intent of Congress to prohibit only that type of discrimination "based solely on nonpayment [which] would encourage reaffirmations, contrary to the expressed policy." Senate Rep. No. 989, 95th Cong., 2d Sess. 81, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5867. As noted in the House Report:

> ... The prohibition does not extend so far as to prohibit examination of the factors surrounding the bankruptcy, the imposition of financial responsibility rules if they are not imposed only on former bankrupts, or the examination of prospective financial condition or managerial ability. The purpose of the section is to prevent an automatic reaction against an individual for availing himself of the protection of the bankruptcy laws. Most bankruptcies are caused by circumstances beyond the debtor's control. To penalize a debtor by discriminatory treatment as a result is unfair and undoes the beneficial effects of the bankruptcy laws. However, in those cases where the causes of a bankruptcy are intimately connected with the license, grant, or employment in question, an examination into the circumstances surrounding the bankruptcy will permit governmental units to pursue appropriate regulatory policies and take appropriate action without running afoul of bankruptcy policy.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess., *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6126.

4. The holding in *Perez* "is a developing doctrine, and its precise ultimate contours are not yet clear. More case law will undoubtedly develop the extent of the discrimination that is contrary to bankruptcy policy." *Id.*

5. In *Perez*, the Supreme Court established "a two-step process of first ascertaining the construction of the two statutes and then determining the Constitutional question whether they are in conflict." 402 U.S. at 644, 19 S.Ct. at 1708, 29 L.Ed.2d at 239. The Court analyzed the legislative history of the state law in question and considered the decisions of the state courts that construed it to determine its purpose and effect. The second step in the test is the determination of the effect of the state law on the Federal law and whether there is a conflict. This Court has applied the *Perez* test in declaring unconstitutional a Maryland state exemption statute. *In re Locarno*, 23 B.R. 622 (Bankr.D.Md.1982).

6. The General Assembly has enacted a comprehensive regulatory plan governing the horse racing industry in Maryland. Md.Ann.Code art. 78B (1988). The statute created the Maryland Racing Commission as part of the Department of Licensing and Regulation. The jurisdiction of the Racing Commission extends to virtually every aspect of horse racing conducted within the State of Maryland where any meet is conducted for a stake, purse or reward. Art. 78B, section 1. The Commission employs four Stewards, three of whom shall be at every race meeting conducted by any licensee authorized by the Commission to conduct races. Art. 78B, section 5(b).

7. Pursuant to this grant of authority from the legislature, the Commission promulgated detailed regulations known as "Thoroughbred Rules" which apply to "all persons, individuals, associations, or corpo-

---

of the Act entitled "An Act making appropriations for the Department of Agriculture for the fiscal year ending June 30, 1944, and for other purposes," approved July 12, 1943 (57 Stat. 422; 7 U.S.C.. § 204), a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankruptcy or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act. 11 U.S.C. § 525 (Supp. V 1987).

rations holding or conducting any meeting within the State licensed by the Maryland Racing Commission, at which horse racing is permitted for any stake, purse or reward; and to all owners, trainers, jockeys, jockeys' agents, grooms, or .other persons who participate in racing at any of these meetings." Md.Reg.Code title 09, § 10.01.01(A). Among these rules are those requiring financial responsibility, upon the alleged violation of which the debtor's trainer's license was suspended.

8. The authority of the Commission to construe its own rules is compatible with the full power the General Assembly bestowed upon it to control horse racing. *Mules v. Maryland Racing Commission,* 30 Md.App. 533, 353 A.2d 664 (1976).

9. No reported decisions have been found construing the particular regulations at issue here regarding the suspension of horse trainers' licenses for the trainers' failure to maintain financial responsibility. Nevertheless, there are a number of Maryland cases on the general subject of thoroughbred horse racing which provide some guidance regarding the history and scope of its regulation by the government of this state.

In *Maryland Racing Commission v. Maryland Jockey Club,* 176 Md. 82, 4 A.2d 124 (1939) *sub. nom. Spencer v. Maryland Jockey Club,* 176 Md. 82, 4 A.2d 479 (1939), the Maryland Court of Appeals upheld as a valid tax on the Pimlico Race Track in Baltimore City, a statutory fee which the State then paid over to the Treasurer of Baltimore County. In the course of its opinion, the court remarked that "[t]here is no contention that the license and regulation of racing is not within the police power of the State." 176 Md. at 86, 4 A.2d at 126.

In *Mahoney v. Byers,* 187 Md. 81, 48 A.2d 600 (1946), the Court of Appeals reviewed the act of the Maryland General Assembly which created the Maryland Racing Commission:

> The Act of 1920 makes racing legal in Maryland, when conducted in conformity with its provisions and such reasonable rules and regulations lawfully adopted by the Commission. Trainers of race horses have a right under the Act to engage in their vocation as they conform to the provisions of the Act and reasonable rules and regulations adopted by the Commission. A violation of such right by the Commission can be reviewed by the court in a mandamus proceeding. In reviewing the act of the Commission the court has power to correct errors in law but it cannot substitute its discretion for the discretion of the Commission where there is evidence that reasonably justifies the Commission's finding even though the court may disagree with the Commission. The court may cure abuses of discretion and arbitrary, illegal, capricious or unreasonable acts but must take care not to interfere with the legislative prerogative, or with the exercise of sound administrative discretion where discretion is clearly conferred. [citations omitted].

187 Md. at 85–86, 48 A.2d at 602–603. In *Brann v. Mahoney,* 187 Md. 89, 48 A.2d 605 (1946), the Court of Appeals observed that Article 78B of the Maryland Code "gives power to the Racing Commission which prescribes rules and regulations under which all horse races shall be conducted in this State." 187 Md. at 102–103, 48 A.2d at 611. The court quoted from its earlier decision in *Maryland Theatrical Corp. v. Brennan,* 180 Md. 377, 383, 24 A.2d 911, 915 (1942):

> The usual rule with respect to delegations of the police power to administrative officials is that they must be surrounded by such safeguards that the official cannot arbitrarily, at his own will and pleasure, determine whether or not certain businesses or amusements can operate.

187 Md. at 103, 48 A.2d at 611.

In *Greenfeld v. Maryland Jockey Club of Baltimore,* 190 Md. 96, 57 A.2d 335 (1948), the Court of Appeals reviewed the history of the state's supervision of the horse racing industry:

> Wagers were legal at common law. In Maryland betting on horse races (including 'Paris Mutual' pools) was not a crime at common law or until 1890 by stat-

ute.... Since 1890 betting on a horse race, except within the ground of the race course, has been prohibited. The Act of 1898, sec. 124A, Art. 27, sec. 291 prohibits betting on a horse race, but sec. 124B, Art. 27, sec. 292, excepted betting within the ground of any race course licensed under section 124C, Art. 27, sec. 293. In *Close v. Southern Maryland Agr. Ass'n*, 1919, 134 Md. 629, 108 A. 209, the licensing provisions of the Act of 1898 were held unconstitutional. The original Racing Commission Act of 1920, ch. 273, sec. 10, Art. 78B, sec. 10, expressly provided that a license from the commission should be in substitution for a license under the Act of 1898. This mention of the Act of 1898 was omitted when section 10 was amended by the Act of 1947, Ch. 502. See also as to betting on horse races, *Clark v. Harford Agricultural & Breeders' Ass'n*, 118 Md. 608, 621, 85 A. 503; *Agricultural Soc. of Montgomery County v. State*, 130 Md. 474, 480, 481, 101 A. 139; *Noland [sic] v. State*, 157 Md. 332, 334, 336, 146 A. 268. In *Nolan v. State* the court said that the Act of 1920 "created a commission known as the 'Maryland Racing Commission' which was thereby authorized to issue licenses to 'any person or persons, association or corporation desiring to conduct racing within the State of Maryland,' who had complied with the provisions of the act, and was passed in substitution for the four last sections of chapter 285 of the Act of 1898 (Sections 248 to 251, inclusive, of the Code of 1924), as those sections, authorizing the court to issue such licenses, had been declared unconstitutional. It is true that it goes more into detail as to matters of regulation, but, with the exception of creating a commission, it is no more comprehensive in its scope than the sections for which it was substituted, and it is clear, we think, that it was not the intention of the Legislature in its passage to repeal section 247 of article 27 of the Code. * * * The object and purpose of the enactment of 1920 was to create, in substitution for the court, a board or body authorized to issue the licenses men-

tioned in the act, and to supervise and regulate the licensees in their management and conduct of the races, and to permit betting thereat, under the conditions imposed." 157 Md. at page 336, 146 A. at page 269.

Amendments to the Act of 1920 have gone still "more into detail as to matters of regulation", but have not changed the nature and purpose of the act from licensing and regulation of a private business to creation and management of a public business—from licensing racing, regulating the licensees in their management of the races, and "permit[ting] betting thereat, under the conditions imposed", to making betting a right of citizenship. Racing indeed is not "a strictly private business". It is a minutely regulated, heavily taxed business in which private rights and responsibility have not been wholly extinguished. *Mahoney v. Byers*, 187 Md. 81, 48 A.2d 600, 603; *Brann v. Mahoney*, 187 Md. 89, 48 A.2d 605. The commission has power "to prescribe rules, regulations and conditions under which all horse races shall be conducted", and "may make rules governing, restricting or regulating betting on such races." Sec. 11. By other provisions of the law certain licenses confer "betting privileges" on the licensees. The law protects bettors against fraud or extortion and by recent amendments requires each licensee, "as agent of the Commission," to make certain deductions from money wagered, to create a fund to be expended, with the permission of and upon conditions prescribed by the commission, for improvements which will "promote the safety, convenience and comfort of the racing public and of horse owners generally". Sec. 11A, Acts of 1947, ch. 502. But the law confers no personal right on individuals to attend or bet at race meetings. [Some citations omitted.]

190 Md. at 103–105, 57 A.2d at 337.

[In the 1919 case of *Close v. Southern Maryland Agricultural Assn.*, *supra*, the Court of Appeals set the stage for the creation of the Maryland Racing Commis-

sion by declaring unconstitutional as violative of the principle of separation of powers an 1898 Act of the General Assembly empowering circuit court judges to issue licenses for race tracks.]

In *Southern Maryland Agricultural Assn. of Prince George's County v. Magruder,* 198 Md. 274, 81 A.2d 592 (1951), the Court of Appeals addressed the legality of the *ex parte* appointment of a receiver to administer the affairs of a race track corporation licensed by the Maryland Racing Commission. Despite its characterization of the action as "one of the most drastic remedies known to our practice," 198 Md. at 277, 81 A.2d at 593, the court nevertheless upheld the order of the trial judge because of the need for emergency action in light of the corporation's mismangement, including violations of Commission rules and regulations and the imminent, adverse response of the Commission. The court commented at length upon the Commission's authority to control horse racing:

A perusal of the relevant Maryland statutes will demonstrate that the General Assembly has established a broad policy of prohibiting the commercial exploitation of the public's gambling instinct. Article 27, Sections 288 to 301, inclusive. *Gaither v. Cate,* 156 Md. 254, 144 A. 239. The Legislature has deviated from this policy by the exception in favor of betting at race tracks provided in Section 292, and by the enactment of Article 78B. This statute permits the operation of race tracks at which horse racing, with attendant betting, is allowed under very close regulation and supervision. The Maryland Racing Commission is given exceedingly wide and comprehensive regulatory powers. Examination of the 3rd Interim Report of the Kefauver Committee of the United States Senate demonstrates the wisdom of the Legislature in thus providing adequate controls where it determines that the anti-gambling laws are to be relaxed. Section 10 of Article 78B not only authorized the Commission to withhold the award of any days to an applicant for racing privileges, but to suspend or revoke its license for any cause. Section 11 empowers the Commission to require the removal of any

employee or official employed by any licensee. It is apparent that the Legislature deliberately imposed grave responsibility upon the Racing Commission in order that this exception to the anti-gambling laws of the State be kept within proper limits.

198 Md. at 279–280, 81 A.2d at 594.

The Court of Appeals held in *Maryland Racing Commission v. McGee,* 212 Md. 69, 128 A.2d 419 (1957) that the license of a horse trainer was properly revoked by the Commission for violating its rule that the trainer adequately guard his horse to prevent it from having a drug administered to it before a race. In so holding, the court stated:

It has been held that a rule making a trainer of race horses an insurer of the fact that the horse has not been given a drug before a race, is a valid rule which the authorities in charge of regulation of racing can make without affront to the constitutional rights of the trainer. *Sandstrom v. California Horse Racing Board,* [31 Cal.2d 401], 189 P.2d 17, *certiorari denied,* 335 U.S. 814 [69 S.Ct. 31], 93 L.Ed. 369; *State v. West Virginia Racing Commission* [133 W.Va. 179], 55 S.E. 2nd 263. In each case the Court found the holding in *Mahoney v. Byers* not to be controlling, although for different reasons. Both Courts found that a state, in the exercise of its police power, may regulate race tracks and has plenary authority to do so if the regulation is reasonable. Reasonableness depends on the character or nature of the conditions to be met or overcome. The rule making the trainer the insurer of the horse's condition, although stringent, they held, is not unreasonable. This Court noted once again in *Southern Md. Agri. Assoc. v. Magruder,* 198 Md. 274, 279 [81 A.2d 592], as it had in the *Byers* case and previous cases, that the nature and problems of racing not only permit, but require, strict regulations by the State.

212 Md. at 75–76, 128 A.2d at 423.

In upholding the right of the Commission to sanction a horse trainer for committing a violation of its rules involving the sale of a

horse outside of the territory of the state, the Court of Appeals held in *Jacobson v. Maryland Racing Commission,* 261 Md. 180, 274 A.2d 102 (1971):

> ... Horse racing is an endeavor and undertaking that necessarily must be the subject of intensive, extensive and minute regulation. *Greenfeld v. Md. Jockey Club,* 190 Md. 96, 104–105 [57 A.2d 335]. It exists only because it is financed by the receipts from controlled legalized gambling which must be kept as far above suspicion as possible, not only to sustain and profit the racing fraternity but to feed substantial, although by today's standards relatively few, millions to the State's revenues. Not surprisingly the legislature has given the Commission full power to control racing. Code Art, 78B, § 1, provides that the Commission "shall be vested with and possessed of the powers and duties in this article specified and also the powers necessary or proper to enable it to carry out fully and effectually all the purposes of this article." Section 11(a) says that the Commission "shall have full power to prescribe rules, regulations and conditions under which all horse races shall be conducted within the State of Maryland." This Court held in *Mahoney v. Byers,* 187 Md. 81, 84 [48 A.2d 600], that the Commission "has power and authority to promulgate reasonable rules to govern the racing of horses. It may make such rules regulating the conduct of trainers, jockeys, owners, and generally regulate all matters pertaining to horse [races], in order that they may be conducted fairly, decently and [cleanly] but may not revoke a license except for cause."
>
> Faithful to the authorizing directives of the statutes the Commission has promulgated several hundred rules. An owner may not race until licensed, and a trainer may not function until licensed. "Persons entering horses to run on licensed Maryland tracks agree in so doing to accept the decision of the Stewards on any question relating to a race or to racing." [Some citations omitted.]

261 Md. at 183–184, 274 A.2d at 103–104.

In *Mules v. Maryland Racing Commission, supra,* the Maryland Court of Special Appeals held that the license of a veterinarian to practice equine veterinary medicine at race tracks was properly suspended and later denied renewal upon his conviction for violating federal narcotics laws, even though the conviction was not a final judgment by reason of his filing an appeal. In the course of its opinion, the court held:

> In making our determination of the meaning of "convicted of a crime", we are strongly persuaded by the view of the Commission. Not only is the general rule that courts are not permitted to substitute their judgment for the expertise of those persons who constitute the administrative agency from which the appeal is taken, *Grosman v. Real Estate Comm'n.,* 267 Md. 259, 265 [297 A.2d 257] (1972), and see Code, art. 41, § 252(d), but the authority of the Commission to construe its own Rules is compatible with the full power the General Assembly bestowed upon it to control horse racing. Further, it is patent that the interpretation adopted by the Commission is not only consistent with, but essential to, its function and duty to see that horse racing is conducted fairly, decently and cleanly. The nature of the crime here, as the Commission believed, clearly could bear a direct and substantial relationship to horse racing. To permit a person to practice veterinary medicine at the tracks, after being found guilty of such a crime, during the protracted period of time it takes to exhaust appellate procedures would be contrary to the public interest. We find support for the view that "conviction of a crime" is satisfied upon the rendering of a verdict of guilty in the Rules themselves. Commission Rule 09.10.56.18 recognizing the need for prompt action to preserve the integrity of horse racing, provides that when a person subject to the jurisdiction of the Commission "is formally charged with violation of ... any criminal statute of this or any other State, the Commission may suspend him until the charge has been tried, dismissed or otherwise disposed of." Unless the charge

is dismissed or otherwise disposed of, the suspension is authorized until the person is "tried" thereon. If "conviction of a crime" required exhaustion of all appeal remedies, there would be a vacuum between the trial resulting in a verdict of guilty and the "conviction." During that period the suspension would not be in effect, and the Commission would be powerless to act. Patently, this was not the intent of the Rules. [Footnotes omitted.]

30 Md.App. at 547–548, 353 A.2d at 672. The court made other significant pronouncements in two footnotes to its decision:

 In *Comptroller v. Rockhill, Inc.*, 205 Md. 226, 234 [107 A.2d 93] (1954), the Court said:

"There are several different classes of administrative rules. Some are legislative rules, which receive statutory force upon going into effect. Others are interpretative rules, which only interpret the statute to guide the administrative agency in the performance of its duties until directed otherwise by decisions of the courts. Some rules are merely rules of procedure. Others implement the statute by stating the policy by which the agency will be governed in the exercise of its authority."

We think that the Commission Rules are by nature legislative rules which received statutory force upon going into effect. [16.] We observe that the authority of the Commission to refuse to issue or renew a license under Commission Rule 09.10.24.02 is discretionary. Thus, the nature of the crime of which an applicant is convicted may be considered by the Commission.

*Id.*

The Maryland Court of Appeals noted in *Silbert v. Ramsey*, 301 Md. 96, 482 A.2d 147 (1984), that "The Maryland Racing Commission was created by the legislature with the 'full power to prescribe rules, regulations and conditions under which all horse races shall be conducted within the State of Maryland, ...' *The statute com-*

*bined with the Commission's rules and regulations provide a comprehensive scheme for the regulation of horse racing in Maryland."* [Emphasis supplied, citation of the statute omitted.] 301 Md. at 105, 482 A.2d at 152.

The Court concludes that the horse racing industry in Maryland is subject to the strict and exclusive control of a state racing commission with a broad grant of authority conferred upon it by the state legislature.

10. In its memorandum [P. 8], the Maryland Racing Commission offered this explanation of the purpose behind its financial responsibility rules:

In the horse racing industry (Maryland's third largest industry) in particular, it is mandatory that there be rules of financial responsibility for all licensees. The continuation of the viability of the industry is premised upon a symbiotic relationship between the various individuals who participate. For example, a trainer is dependent upon the financial responsibility of the owner of the horse; the feedmen and veterinarians are dependent on the financial responsibility of the trainer; the jockey is dependent upon the financial responsibility of the trainer and the owner; and the owner may be dependent upon the financial responsibility of the individual who sold him his horse. Thus, enforcement of the financial responsibility rules, *in a non-discriminatory manner*, is mandatory for the viability of the racing industry.

*Memorandum* [P. 8] page 7. The debtor has not contested this statement of purpose underlying the rules in question.

 11. The Court has carefully reviewed the various provisions of the Maryland Racing Commission Thoroughbred Rules relating to the qualifications required of persons to be licensed as horse trainers and has drawn the following conclusions. First, the lack of financial responsibility is only one of eight separate grounds set forth in Rule 10.01.25(B) for the denial, suspension or revocation of a horse trainer's license. The other seven involve *prohibited acts or omissions* of a

licensee, which include violations of criminal laws; violations or attempted violations of racing laws; violations of Maryland Racing Commission Rules; associating with persons convicted of violations of criminal laws; consorting with gamblers; fraudulent conduct in relation to horse racing or breeding; and misconduct connected with the trainer's duties on the race track, or conduct detrimental to racing. Md.Regs. Code title 09, 10.01.25(B)(1), (2), (3), (5), (6), (7) and (8) (1988). "Financial irresponsibility" in this context would likewise amount to acts or omissions, that is, "conduct detrimental to racing." *Id.* (4). Because the rule prohibits irresponsible *conduct* as opposed to a *condition of insolvency,* the Commission's promulgation of this rule does not run afoul of *Perez, supra.* It does not *per se* preclude one from obtaining a horse trainer's license because of impoverishment. There is no requirement in the rule that one must enjoy a certain position of wealth in order to qualify. Second, there is a subtle but important distinction between requiring a debtor to make good on outstanding debts (which are dischargeable in bankruptcy) as opposed to requiring licensees to demonstrate their *prospective* financial responsibility as a condition for the granting or renewal of licenses. This rule does not *per se* require the debtor to satisfy his outstanding judgments. Third, the prohibition against financial irresponsibility, in conjunction with the others enumerated above, is reasonably related to the protection and promotion of the horse racing industry in Maryland. The Commission has promulgated this rule within the exercise of its ample discretion.

12. *Duffey v. Dollison,* 734 F.2d 265 (6th Cir.1984) held constitutional as applied to debtors whose unsatisfied tort judgments had been stayed or discharged in bankruptcy an Ohio law requiring proof of financial responsibility as a prerequisite for the issuance of a driver's license. Although factually similar to *Perez,* a major distinguishing feature in *Duffey* was the statute which did not *per se* require the satisfaction of unpaid judgments. Because the statute did not discriminate between debtors and nondebtors, and because it was not being used to coerce debtors into reaffirming discharged debts, the court sustained the state statute. 734 F.2d at 273. This appears to be the situation in the case *sub judice.*

13. In a case factually similar to the case at bar, it has been held that the regulation of horse racing is "a proper exercise of the police power reserved to the states" and that the license to race horses issued to a trainer and owner who filed a joint Chapter 7 bankruptcy petition with his wife was validly suspended based upon his prior financial misconduct in writing bad checks.[6] *In the Matter of Alessi,* 12 B.R. 96 (Bankr. N.E.Ill.E.D.1981).

Among the decisive factors the court considered in addition to the bad checks were the debtor's substantial indebtedness to equipment companies, feed companies, veterinarians and horse owners, the accumulation of $19,500 in gambling debts, and the suspension of his license a year earlier by the racing board of another state because of dishonored checks. The opinion emphasized the fact that the debtor was obligated to others engaged in horse racing, which subjected him to their influence and thereby endanged "the integrity of the sport." *Id.* at 99.

14. In the instant case, the Maryland Racing Commission did not suspend the debtor's license *solely* because he filed bankruptcy or because he was insolvent before the bankruptcy petition was filed. The multiple reasons for his license suspension include (1) the magnitude of personal debts owed by the debtor ($64,138.43) and

---

**6.** It should be noted that the instant case involves a Chapter 12 bankruptcy, in the course of which a debtor who is a family farmer normally submits a plan of reorganization to repay creditors. 11 U.S.C. §§ 101(18), 1222 (Supp. V 1987). This Court denied confirmation to the debtor's plan on May 24, 1989, sustaining objections of two creditors with leave to amend by the debt-

or. The confirmation of such a Chapter 12 plan which passes muster *may* amount to a showing of financial responsibility so as to satisfy the Commission. On the other hand, a debtor's mere reaffirmation of debts, without the ability to repay them, might not necessarily amount to a demonstration of financial viability.

by the debtor's corporation ($187,211.09); (2) the fact that a majority of these debts arose from the debtor's buying and selling of race horses; (3) three previous suspensions of the debtor's license in 1987 and 1988 for failing to maintain workers' compensation insurance and for failing to satisfy a monetary judgment; and (4) the filing of the debtor's bankruptcy case.[7]

15. "Where several reasons for an action are proffered and one is proscribed by section 525, the governmental unit may find itself the subject of judicial inquiry as to whether the untainted reasons are credible in light of the circumstances leading up to, and the timing of, the action." Chabot, *Anti–Discrimination Under the Bankruptcy Laws*, 60 Am.Bankr.L.J. 185, 194 (1986).

16. The timing of the suspension of Mr. Christmas' trainer's license by the Stewards occurred on October 13, 1988, more than two months before he filed bankruptcy. Their action was based upon an unpaid judgment of $16,219.65 obtained, not against Mr. Christmas personally, but against the corporation he owns and controls. Given the stringent regulation of the sport of thoroughbred horse racing, that decision was within the Stewards' discretion. They were clearly acting within the scope of their authority in suspending the license and their decision was ratified by the Commission, based upon additional evidence of financial irresponsibility and within its own broad discretion granted by the legislature. The main point here is that the license suspension by the Stewards in October, 1988 was not based upon the debtor's bankruptcy.

17. In a case involving the suspension of the license of a horse owner-trainer based upon the allegation that his race horse had been administered a drug, the Fourth Circuit Court of Appeals stated in *Hubel v. West Virginia Racing Commission*, 513 F.2d 240 (1975) that the "Commission does not dispute that Hubel's permit

as an owner-trainer is a property right and that due process requires that Hubel be given notice, a hearing, and an opportunity to defend his interest if the permit is to be suspended or revoked." 513 F.2d at 242. In the instant case, Mr. Christmas' license as a horse trainer is a property right which was suspended by the Maryland Racing Commission after full and complete due process was afforded the debtor. In point of fact, the hearing before the Commission of which he complains was held at his request and conducted with his full participation and that of his attorney.

18. Section 362 of the Bankruptcy Code provides an automatic stay of the commencement or continuation of administrative proceedings against the debtor that were commenced or could have been commenced before the filing of the bankruptcy petition, and any act to obtain possession of property of the estate or to exercise control over property of the estate. 11 U.S.C. § 362(a)(1), (3) (Supp. V 1987).

19. However, section 362(b)(4) provides an exception to the imposition of an automatic stay where a governmental unit seeks to enforce its police or regulatory power. 11 U.S.C. § 362(b)(4) (Supp. V 1987). *See In re County Fuel Company, Inc.*, 29 B.R. 534 (Bankr.D.Md.1983) (Automatic stay does not apply to administrative enforcement proceedings brought against a debtor by the Department of Energy acting to enforce its police or regulatory powers); *In re Alessi, supra* (state racing board's denial of a horse trainer's license for financial irresponsibility was within the scope of its police power to regulate horse racing).

20. This Court holds the actions of the Maryland Racing Commission in the enforcement of its rules of financial responsibility by suspending the debtor's license as a horse trainer in the instant case to have been a valid exercise of the state's police and regulatory power to which the automatic stay of section 362 does not apply.

---

7. Although the Commission's opinion did not specifically mention the debtor's mismanagement of his business affairs, such mismanagement can be inferred from the finding that he was "financial irresponsible." The opinion did not determine that the debtor was insolvent at the time his license was suspended.

21. Considering the minute regulation of the sport of thoroughbred horse racing in Maryland, the comprehensive legislative delegation of police power to the Maryland Racing Commission and its promulgation of rules governing every aspect of the sport, and in light of the *Perez* case and the legislative history of section 525 of the Bankruptcy Code, this Court finds that Maryland Racing Commission Thoroughbred Rules 10.01.25(B)(4) and 10.01.57C have neither the purpose nor the effect of frustrating Federal law. In promulgating Rule 10.01.57, the Commission has seemingly covered every duty and obligation of a horse trainer from "A to Z." Neither rule makes any reference whatsoever to bankruptcy, but merely prescribes the qualifications and conditions necessary to obtain and maintain a horse trainer's license. One such qualification and condition is that the trainer be "financially responsible."

Mr. Christmas' license was suspended by the Commission due to his financial irresponsibility, under a rule which applies equally to debtors as well as nondebtors. While a debtor in bankruptcy receives certain types of protection, the prohibitions in the Bankruptcy Code against discrimination do not require that debtors receive favorable treatment by being excused from a state requirement of financial responsibility from which nondebtors are not excused. Such a policy would not only confer an unfair advantage upon debtors, but would also frustrate the state's police and regulatory powers, and would make the filing of bankruptcy attractive to those who seek to shortcut proper regulation and orderly administrative procedures required under state law. It would further represent an unwarranted intrusion by the Federal bankruptcy court into an area of regulation wholly preempted by the state, a clear violation of Federal-state comity.

The Court finds that the Maryland Racing Commission's suspension of Mr. Christmas' trainer's license did not violate section 525. The Commission enforced its financial responsibility rules in a non-discriminatory manner. Moreover, the suspension of his license did not deprive the debtor of his ability to obtain a "fresh start." The loss of Mr. Christmas' license will not prevent him from conducting his farming operation or from continuing to breed and board horses.

For all these reasons, the instant complaint for injunctive relief against the Maryland Racing Commission will be dismissed.

ORDER ACCORDINGLY.